**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| SALOMON & LUDWIN, LLC, | ) |
| | ) |
| Plaintiff, | ) Case No. 3:24-cv-389 |
| | ) |
| v. | ) |
| | ) **PLAINTIFF'S VERIFIED COMPLAINT** |
| JEREMIAH WINTERS, CATHERINE | ) **FOR DAMAGES AND DECLARATORY** |
| "KATE" ATWOOD, JENNIFER | ) **AND INJUNCTIVE RELIEF** |
| THOMPSON, ABBEY SORENSEN, and | ) |
| ALBERO ADVISORS, LLC, d/b/a | ) |
| FOUNDERS GROVE WEALTH PARTNERS, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT

Plaintiff Salomon & Ludwin, LLC ("S&L"), brings this Verified Complaint against

Defendants Jeremiah Winters, Catherine "Kate" Atwood, Jennifer Thompson, Abbey Sorensen

(together, the "former employees"), and Albero Advisors, LLC, d/b/a Founders Grove Wealth

Partners, LLC ("FGWP"), and alleges as follows:

## INTRODUCTION

1.      S&L brings this Verified Complaint to stop Defendants' willful efforts to compete

unlawfully against it by stealing and using S&L's trade secrets, poaching its clients and

interfering with its business relationships, and harming its business and reputation.

2.      S&L is a Richmond-based wealth management firm that serves clients across the

country.  Dalal Salomon, founder of S&L, has been a Financial Advisor since 1984.  By 2016

she had made *Barron's* Top 100 Women Advisors ranking every single year since its inception

in 2006 and was thus recognized as a Barron's Hall of Fame Advisor.

3.      In 2009, she took her firm independent and formed S&L.  In order to properly service her growing client base, she hired and trained several financial advisors and operations professionals to exclusively service her existing clients and their referrals

4.      For over 15 years, S&L has worked to better the financial position of its clients, manage their assets – and futures – with integrity and transparency, and advance the Richmond community in the process by donating to over 30 different community partners.

5.      S&L's dedication to serving its clients has been fruitful.  The firm has grown and developed a diverse client base of families, entrepreneurs, doctors, executives, and other individuals.  Based on its stellar reputation and service to its clients, the firm's founder has been inducted into the Greater Richmond Business Hall of Fame and, as previously noted, *Barron*'s Hall of Fame for Advisors, among other notable recognitions and accomplishments.

6.      To support its premier financial services, S&L provides its clients with specialized and long-term investment plans and focuses on developing long-lasting relationships and trust with its clients.  To that end, S&L maintains a dedicated team of 12 members, which includes financial advisors, operational professionals, and executives (among others), to ensure its clients have a strong, personal connection to the firm and its advisors.

7.      S&L accordingly invests substantial resources into training its employees to handle a broad array of services and relationship-building.  It hires and trains financial advisors to manage assets as well as operational professionals to handle day-to-day affairs for its clients. S&L's financial advisors and operational professionals, and the connections and relationships they build with the firm's clients, are critical to its operations and success.

8.      Through the provision of services to and ongoing interactions with clients, S&L's financial advisors and operational professionals develop valuable and critical relationships for

S&L's business.  To help them maintain and develop these relationships, S&L provides them with proprietary information it has compiled and developed related to clients and their accounts, including client account names and contact information, among other proprietary information.

9.      In exchange for receiving this proprietary information, S&L's financial advisors and operational professionals must enter employment and confidentiality agreements.  Under these agreements, employees agree not to disclose or misuse S&L's confidential and proprietary information.  They also agree not to solicit S&L's clients or employees for two years following their employment.

10.     Recently, however, S&L has had to combat the sudden efforts by its former employees – Winters, Atwood, Thompson, and Sorensen – and their newly founded investment company, FGWP, to access and exploit S&L's proprietary information and engage in unfair and unlawful conduct against it.

11.     Over a decade ago, S&L hired Winters, Atwood, Thompson, and Sorensen to service S&L clients and their referrals.  The firm spent substantial resources training and mentoring them – even paying for their certifications, testing, and licenses.

12.     With the exception of family members, none of the former employees had their own clients when they joined S&L.  Nor have they recruited new clients to the firm other than through internal referrals.  Yet, S&L continued to invest in each of them to ensure its clients had consistent contacts and relationships with the firm.

13.     But not content with S&L's investments and generosity, the former employees plotted a scheme to line their pockets and harm S&L.  The former employees planned to abruptly resign from S&L, steal its clients, and form FGWP to compete against S&L – and had planned this scheme while employed at S&L.

14.     The former employees did just that, resigning four days ago on May 24, 2024. But unable to compete legitimately, Defendants have resorted to a host of unfair and unlawful schemes to undercut S&L's position in the market, convert and steal S&L's client accounts and other trade secrets, and interfere with its relationships with clients.

15.     Since resigning without prior notice on May 24, 2024, and forming FGWP, the former employees have misappropriated S&L's trade secrets to solicit S&L's clients and convert client accounts.  They have solicited many – potentially hundreds – of S&L's clients to pressure them to transfer accounts from S&L to FGWP.

16.     And following the departure of these former employees, S&L has learned that they deliberately sabotaged the critical development of training manuals and transition processes that they were tasked with completing while employed by the firm.

17.     Defendants' misconduct has caused, and continues to cause, S&L serious and irreparable harm.  Defendants have intentionally and willfully misappropriated S&L's proprietary information and trade secrets, unlawfully interfered with and jeopardized S&L's relationships, and harmed the firm's goodwill and reputation.

18.     Defendants have further forced S&L to expend significant resources to combat their unfair and unlawful conduct.  They have also deprived S&L of the value of its substantial investments in its proprietary information and employees.

19.     Defendants have willfully and knowingly violated their obligations and flagrantly violated federal and state laws to harm S&L and threaten its business going forward.

20.     Accordingly, S&L requires immediate injunctive relief to enjoin Defendants from engaging in their unlawful conduct and prevent the imminent and irreparable harm that S&L will suffer absent such necessary and appropriate relief.

## PARTIES

21.     Plaintiff S&L is a wealth management and advisement firm located in Richmond, Virginia.

22.     S&L is a limited liability company incorporated under the laws of the Commonwealth of Virginia, and whose members are Dalal M. Salomon, Daniel B. Ludwin, and Jacob E. Salomon.

23.     Defendant FGWP is a limited liability company incorporated under the laws of Delaware with its principal place of business at 6802 Paragon Place, Suite 426, Richmond, Virginia, 23230.  On information and belief, its members are Defendants Winters and Atwood, and the former employees are now employees of FGWP.

24.     Defendant Jeremiah Winters is a former employee of S&L and current member and employee of FGWP.  He is domiciled in Virginia, located at 2352 Manakin Road, Manakin-Sabot, VA 23103.

25.     Defendant Catherine "Kate" Atwood is a former employee of S&L and current member and employee of FGWP.  She is domiciled in Virginia, located at 218 Melwood Lane, Henrico, VA 23229.

26.     Defendant Jennifer Thompson is a former employee of S&L and current employee of FGWP.  She is domiciled in Virginia, located at 10198 Williamsville Road, Mechanicsville, VA 23116.

27.     Defendant Abbey Sorensen is a former employee of S&L and current employee of FGWP.  She is domiciled in Virginia, located at 14101 Rockyrun Road, Chesterfield, VA 23838.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because S&L asserts claims arising under the laws of the United States.  S&L asserts claims against Defendants under the Defend Trade Secrets Act ("DTSA").  *See* 18 U.S.C. § 1836(b)(1).

29.     Defendants are subject to the general personal jurisdiction of this Court because they reside and are domiciled in Virginia.  *See CFA Institute v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009).

30.     Defendants are also subject to specific personal jurisdiction of this Court because they substantially injured S&L through their actions and omissions in Virginia.  *See* Va. Code Ann. §§ 8.01-328.1(A)(1) & (3).

31.     The Court has supplemental jurisdiction over S&L's state law claims pursuant to 28 U.S.C. § 1367.

32.     Venue is proper in this District pursuant to 28 U.S.C. §§ 127(a) & 1391(b)(2) because a substantial part of the events giving rise to S&L's claims against Defendants occurred in this District.  Defendants have engaged in unlawful trade practices, tortious conduct, and contractual breaches against S&L in this District.

## FACTUAL ALLEGATIONS

### *S&L Provides Financial Services*

33.     Dalal Salomon, a Nationally recognized financial advisor since 1984, along with Daniel Ludwin, formed S&L in 2009.

34.     S&L provides wealth management and financial services to clients in Richmond and across the United States.

35.     S&L offers clients unparalleled service and a commitment to help them "make smart decisions about their money."[1]

36.     To that end, S&L has adopted a deliberate approach toward its employees to develop strong, long-term relationships with its clients.  These relationships are critical to S&L's business.

37.     S&L has a team of 12 members, composed of 4 financial advisors, 4 operational professionals, a trader, and three executives.

38.     Financial advisors operate to provide general asset management and financial planning and advice.

39.     Operational professionals maintain day-to-day interactions with S&L's clients to ensure they receive a premier client experience and develop long-standing relationships.

40.     S&L's financial advisors and operational professionals receive extensive and comprehensive training to advise clients and manage their asserts.

41.     The firm mentors and trains its employees, pays fees necessary to obtain their licenses and certifications, and provides other resources for them to develop strong relationships with current and prospective clients.

42.     During their training and employment with S&L, financial advisors and operational professionals receive access to substantial amounts of confidential and proprietary information.

43.     This information includes compiled client information, client lists, client account names and numbers, and related financial information.

---

[1] *See Salomon & Ludwin*, https://salomonludwin.com/ (last visited May 28, 2024).

44.     S&L also provides its financial advisors and operational professionals with information related to S&L's operating procedures, existing or forthcoming products and services, including its patented TriggerPoint™ Strategy, and strategic business plans.

45.     S&L's proprietary information is extremely valuable.  If publicly disclosed and used, competitors could easily target and solicit S&L's most valuable and valued clients.

46.     S&L develops and maintains its proprietary information in its Richmond office.

47.     S&L invests substantially in compiling and developing its proprietary information to protect its market position as a highly regarded wealth management firm, spending substantial funds and time to develop its proprietary information, including but not limited to its client information, client lists, and client accounts and names – all of which have taken years to develop and build.

48.     S&L provides its employees with the proprietary information noted above to support their efforts to provide quality client services and develop important and valuable client relationships with S&L.

49.     None of S&L's proprietary information is publicly available.

50.     Given the significant value of and investments in developing its proprietary information, S&L goes to great lengths to protect this information.  Employees must use unique passwords and user identification to access specially-made systems where the information is stored.

51.     Through their targeted and long-term engagements with clients, S&L's financial advisors and operational professionals develop goodwill and relationships with clients on behalf of the firm.

52.     These relationships are valuable and critical to S&L's business.

53.    ***Non-Solicitation Obligations.***  To protect S&L's substantial investments in its employees, proprietary information, and client relationships, S&L requires its financial advisors to enter a Financial Services Professional Employment Agreement ("FS Agreement").  Exhibits ("Exs.") 1-2.

54.    It also requires operational professionals to enter an Administrative Professional Employment Agreement ("AP Agreement," with "FS Agreement," "Employment Agreement"), Exs. 3-4.

55.    The FS Agreement and AP Agreement contain the same or substantially similar terms.

56.    Financial advisors and operational professionals are hired as "at will" employees. FS Agreement § 12; AP Agreement § 12.

57.    Under the Employment Agreement, financial advisors and operational professionals agree that S&L "owns all current and future clients, client relationships, and equity in such client relationships, as well as rights to all revenue generated from such clients" by S&L. FS Agreement § 7; AP Agreement § 7.

58.    To that end, financial advisors and operational professionals agree to non-solicitation obligations.

59.    Thus, they agree not to "solicit any supplier, service provider, customer, or other business relation" of S&L "that has previously referred business to the company . . . to become a business relation of Employee" during the time of their employment with S&L and for two years after the employment ends ("Restricted Period").  FS Agreement § 15(a)(ii); AP Agreement § 15(a)(ii).

60.     They also agree not to "suggest to a business relation of the Company that the business relation should reduce or terminate the business relation's business or relationship with the Company," or directly or indirectly "provide any financial services or sell financial service products to clients of the Company."  FS Agreement § 15(a)(iii)-(iv); AP Agreement § 15(a)(iii)-(iv).

61.     For any breach of the Employment Agreement's non-solicitation provision, an employee must, as liquidated damages for each breach, pay S&L an amount equal to three times the total "Gross Revenue" earned from "such client(s) . . . during the previous twelve (12) month period."  FS Agreement § 15(b)(i); AP Agreement § 15(b)(i).

62.     Gross Revenue is defined as "all revenue generated by a client that has been earned" by S&L.  FS Agreement § 15(b)(iii); AP Agreement § 15(b)(iii).

63.     The liquidated damages "shall be paid on a promissory note maturing in twelve (12) months and bearing interest at the Prime Rate" plus "two percent" per annum.  FS Agreement § 15(b)(ii); AP Agreement § 15(b)(ii).

64.     In entering an Employment Agreement, each financial advisor and operational engineer agrees that the non-solicitation restrictions are "reasonable in scope" and that "such restrictions afford fair protection to the interests of [S&L]."  FS Agreement § 16; AP Agreement § 16.

65.     Additionally, they agree that S&L's relationships with its clients, customers, or any business relation "are trade secrets that the Company has developed through great time, effort, and expense," the non-solicitation restrictions "are essential to protect such trade secrets," and that any breach "of a restriction constitutes a prohibited conflict of interest and unfair competition."  *Id.*

66.   ***Confidentiality Obligations.***  Financial advisors and operational professionals also agree not to disclose any "confidential information."  FS Agreement § 14; AP Agreement § 14.  Confidential information broadly includes "information relating to customers, clients, suppliers, investors, lenders, consultants . . . customer and client lists, price lists and pricing policies . . . financial statements and information," and "all notes, analyses, compilations, studies, summaries, reports, manuals, documents, and other materials prepared by or for" S&L "containing or based in whole or in part on any of the foregoing."  FS Agreement, Ex. C, § 2(a); AP Agreement, Ex. B, § 2(a).

67.   Financial advisors and operational professionals agree that all confidential information is "owned or licensed" by S&L; is deemed "valuable, proprietary, and confidential"; and "derives independent actual or potential commercial value from not being generally known or available to the public."  FS Agreement, Ex. C § 2(b); AP Agreement, Ex. B § 2(b).

68.   They also agree they "will not any time claim, any right, title or interest of any kind" in S&L's confidential information, and are prohibited from disclosing or using such information during or after their employment for their "personal benefit" or the "benefit of any other" third-party.  FS Agreement, Ex. C § 2(b); AP Agreement, Ex. B § 2(b).

69.   If a financial advisor or operational engineer breaches their confidentiality obligations, S&L is entitled to damages "from the [e]mployee" as well as "preliminary and  . .  injunctive" relief given the parties agree that S&L will "suffer irreparable harm in the event of such breach."  FS Agreement, Ex. C § 3(a)-(b); AP Agreement, Ex. B § 3(a)-(b).

70.   The Employment Agreement also provides that S&L is "not part of or subject to broker protocols," including protocols related to client solicitation or confidential information,

and that the agreement "shall apply and control in the event that any terms" of the agreement or broker protocols conflict.  FS Agreement § 25; AP Agreement § 25.

### *S&L Hires Winters, Atwood, Thompson, And Sorensen To Provide Client And Financial Services*

71.     Starting in or around 2009, S&L began steadily to hire additional financial advisors and operational professionals.

72.     To that end, S&L hired Winters, Atwood, Thompson, and Sorensen between 2009 and 2017.  Winters and Atwood became financial advisors and Thompson and Sorensen worked as operational professionals.  Exs. 1-4.

73.     These former employees received extensive and comprehensive training from S&L to provide premier client and financial services as well as asset management.

74.     S&L paid for all of their relevant certifications, testing, and other costly requirements.

75.     Indeed, S&L is where Winters and Atwood received most, if not all, of their financial advisor training and development.  Winters at one point begged S&L to join the firm given its reputation and opportunities for his career.

76.     The former employees also had access to S&L's confidential and proprietary information, including customer information, customer account names and numbers, and related financial information.

77.     Each of the former employees entered an Employment Agreement with S&L that contained the same or substantially similar terms and conditions, including those as previously alleged herein.  *Supra* at ¶¶ 53–70; Exs. 1-4.

78.     Specifically, Winters and Atwood each entered an FS Agreement, while Thompson and Sorensen each entered an AP Agreement.  Exs. 1-4.

79.     Thus, the former employees were prohibited from using or disclosing S&L's confidential and proprietary information.  *See* Exs. 1-2, Ex. C; Exs. 3-4, Ex. B.

80.     They were also prohibited from soliciting S&L clients or business relations for two years following their employment with S&L.  Exs. 1-4.

81.     Winters, Atwood, Sorenson, and Thompson each worked directly with hundreds of S&L's clients located in Virginia and other states across the United States.

82.     With the exception of family members, none of the former employees had their own clients when they joined S&L.  Exs. 1-2, Ex. B.

83.     Additionally, none of the former employees ever developed their own clients – or even prospected to bring in new clients – while working for S&L, instead relying on in-house or other referrals from clients already working with S&L.

84.     Even though the former employees did not bring in a single client to S&L, they continued to receive substantial compensation and benefits from S&L.

85.     Indeed, S&L paid Winters approximately $650,000 per year in compensation and benefits, while Atwood, Sorensen, and Thompson each were paid over $250,000.

### *The Former Employees Suddenly Leave S&L To Form FGWP,*<br>*Stealing Trade Secrets And Clients And Harming The Firm On Their Way Out*

86.     Not satisfied with their role at S&L, the former employees began devising a plan to line their pockets by willfully stealing S&L's clients and sabotaging its operations.

87.     In the lead up to their eventual departure, the former employees founded a competing wealth management firm, FGWP, on or around April 1, 2024.  Ex. 5, Albero Advisors, LLC Proof of Delaware Incorporation; Ex. 6, FGWP Form ADV.

88.     On information and belief, the former employees also retained a consulting firm, Dynasty Financial Partners, Inc. ("Dynasty"), to assist in the development of FGWP's founding and opening.[2]

89.     The former employees prepared promotional materials, including a video – released on or around May 21, 2024 – to announce their separation from S&L and the opening of FGWP.[3]  A screenshot of the video is provided below:



90.     The former employees also worked deliberately to sabotage S&L's operations to undermine its response to their future departure and potentially cripple S&L's operations.

91.     Given S&L's small size and long-term investment in its employees, the former employees knew that their departure – 2 of S&L's 4 financial advisors and 2 of its 4 operational professionals – would seriously and adversely impact S&L's operations.

---

[2]  *See Dynasty Financial Partners*,
https://dynastyfinancialpartners.com/?utm_source=google&utm_medium=cpc&utm_term=na &utm_content=core &utm_campaign=brand (last visited May 28, 2024).
[3]  Founders Grove Wealth Partners (vimeo.com) (last visited May 27, 2024).

92.     To that end, Thompson halted the development and updating of S&L's training manuals and transition processes for clients.  That manual and those processes are vital to bringing any newly hired staff up to speed on an expedited timeframe.

93.     Thompson was responsible for updating and developing S&L's training manuals and transition processes.

94.     Yet for months, Thompson refused to move the update and developments forward.

95.     Instead, Thompson stalled and intentionally worked to undermine their development to ensure that, when the former employees left, S&L would be seriously hampered in responding to their misconduct and hiring new staff – thus allowing FGWP to promptly solicit S&L's clients.

96.     On information and belief, the former employees worked intentionally and willfully to halt the development and update of S&L's training manual and transition processes, thereby sabotaging S&L's operations and ability to serve its clients.

97.     Timing their resignation for the Memorial Day holiday weekend, the former employees resigned on May 24, 2024, three days after they had already published the FGWP video online on May 21, 2024.

98.     On the same day as their resignation, the former employees actively solicited many of S&L's clients – potentially hundreds.  *See, e.g.*, Ex. 7.

99.     The former employees used S&L's client information, lists, and account names, among other trade secrets and proprietary information, to solicit clients located around the United States and intentionally interfere with S&L's client relationships.

100.    For example, Winters, on behalf of the former employees and FGWP, contacted clients by text message to explain they "lauch[ed]" their own independent wealth management firm, "Founders Grove," and that they would receive more information "over the long weekend" about the new venture.  *Id*.

101.    A screenshot of the text message is provided below:



102.    The former employees also left voicemails, and began pressuring S&L's clients to sign new broker agreements to transfer their accounts and assets to FGWP.

103.    The former employees also implied to certain S&L clients that S&L may not work with them in the future because of its supposed account minimums.

104.     Confused by the mass-departure and the former employees' pressure tactics, clients began calling S&L to understand the situation.

105.     They also expressed concern over the ability of S&L to provide the same level of client services and management given the reduction in personnel.

### Defendants' Unfair And Unlawful Conduct
### Has Caused S&L Serious And Irreparable Harms

106.     Defendants have engaged in a host of unlawful and improper conduct that has harmed – and continues to harm – S&L.

107.     Defendants have intentionally and willfully misappropriated S&L's trade secrets to compete against S&L.

108.     S&L has invested substantial resources to develop proprietary information related to its client records, lists, accounts names, and other related information.

109.     The former employees received access to these trade secrets while employed by S&L.

110.     The former employees each agreed to refrain from disclosing or using such information to advance any interests adverse to S&L.  *See* Exs. 1-4; *supra* at ¶¶ 49–66.

111.     The former employees nevertheless took, disclosed, and used this information to advance their and FGWP's interests and unlawfully compete against S&L.

112.     FGWP further used improper means to misappropriate S&L's proprietary information by inducing the former employees to violate their contractual obligations that prohibit them from disclosing and using such information.

113.     In addition to misappropriating S&L's proprietary information, Defendants engaged in other unlawful and disturbing tactics to compete unfairly against S&L.

114.    FGWP has intentionally induced the former employees to breach post-employment obligations owed to S&L by disclosing S&L's trade secrets and soliciting S&L's employees to further FGWP's interests and harm S&L.

115.    The former employees each breached their express and implied contractual obligations owed to S&L.

116.    The former employees have intentionally disclosed and used S&L's trade secrets to solicit clients for FGWP, a direct competitor of S&L.

117.    Defendants' unlawful conduct has harmed and continues to harm S&L.

118.    To date, Defendants have unlawfully solicited many of S&L's clients – potentially hundreds at this point, and their solicitation remains ongoing.

119.    Defendants have further deprived S&L of the value of its substantial investments in its proprietary information and goodwill and relationships with its clients.

120.    Defendants have also caused continuing and irreparable harm to S&L by intentionally interfering with S&L's client relationships, as well as misusing and misappropriating S&L's confidential information and trade secrets.

121.    Defendants have further harmed S&L's goodwill and reputation with its clients.

122.    S&L has also been forced to expend substantial resources to combat Defendants' unlawful practices and conduct.

123.    Defendants have made clear in their resignation letters and their brazen conduct that they intend to continue soliciting S&L's customers and misusing its trade secrets. *See, e.g.*, Ex. 8.

124.    S&L therefore brings this action to stop Defendants' harmful conduct and remedy the serious and irreparable harms they have caused S&L.

## CAUSES OF ACTION

### COUNT I
**(Violations Of The Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1)
Against All Defendants)**

125.    S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

126.    The DTSA prohibits the misappropriation of trade secrets related to "service[s] used in, or intended for use in" interstate commerce.  18 U.S.C. § 1836(b)(1).

127.    A trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" that derive "independent economic value" from "not being generally known" or "readily ascertainable through proper means by another person" and that its owner "has taken reasonable measures" to keep secret.  *Id.* § 1839(3).

128.    S&L's proprietary compilation of client information, client account names, client account numbers, and related financial information constitute trade secrets under the DTSA.

129.    S&L's information is not generally known or readily ascertainable by proper means.

130.    S&L derives substantial value from its proprietary client account information.

131.    By developing and using that information, S&L has generated substantial revenues through its financial services and developed goodwill with clients.

132.    S&L reasonably protects its trade secrets by requiring all employees to abide confidentiality obligations under employment agreements as a condition of employment and restricting internal access to its trade secrets through security software, password and username protections, and other technologies.

133.     S&L's trade secrets are further related to services offered and used in interstate commerce.  S&L's trade secrets were and are developed in its Richmond, Virginia office and are used to provide client and financial services across the United States.  *See id.* § 1836.

134.     Defendants intentionally and willfully misappropriated S&L's trade secrets through improper means.  *See id.* § 1839(5)(B)(ii)(III).

135.     The former employees gained access to S&L's trade secrets while employed there, including but not limited to its client information, client account numbers and names, client lists, and related financial information.  Exs.1–4.

136.     The former employees each entered employment agreements pursuant to which they each agreed not to disclose or use S&L's trade secrets to advance their personal interests or any third-party's interests.  *Id.*; *supra* at ¶¶ 49–66.

137.     The former employees further knew that S&L's information related to its clients, their account names and numbers, and related information were trade secrets and proprietary, and recognized that in their agreements.

138.     The former employees have nevertheless disclosed and used S&L's trade secrets to further their and FGWP's interests and harm S&L.

139.     FGWP further induced the former employees to disclose and use S&L's trade secrets in violation of their confidentiality obligations to advance FGWP's business and harm S&L.

140.     Defendants have used S&L's trade secrets to solicit S&L's clients and unlawfully compete against S&L.

141.     Defendants' violations of the DTSA have harmed and continue to harm S&L.

142.    Defendants have caused S&L to expend substantial resources to combat their violations of the DTSA.

143.    Defendants have also caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with its clients and in the marketplace.

144.    Defendants have further deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

145.    S&L is entitled to damages and restitution from Defendants, declaratory and injunctive relief, exemplary damages, attorney's fees and costs, as well as other available remedies, as set forth in its Prayer for Relief.  *See* 18 U.S.C. § 1836(b)(3)(B)–(D).

## <u>COUNT II</u>
### (Violations Of The Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 *et seq.*, Against All Defendants)

146.    S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

147.    The Virginia Uniform Trade Secrets Act ("VUTSA") prohibits any misappropriation of an owner's trade secrets.  *See* Va. Code § 59.1-336.

148.     The VUTSA broadly defines a trade secret as any information that "derives independent economic value" from "not being generally known to and not being readily ascertainable by proper means" and is subject to reasonable efforts at maintaining such information's secrecy.  *Id.*

149.    S&L's proprietary compilation of client information, client lists, and client account numbers and names and related financial information constitute trade secrets under the VUTSA.

150.     S&L's information is not generally known or readily ascertainable by proper means.

151.     S&L derives substantial value from its proprietary customer information.

152.     By developing and using that information, S&L has generated substantial revenues through its financial and client services and developed goodwill with clients.

153.     S&L reasonably protects its trade secrets by requiring all employees to enter employment agreements that include confidentiality obligations as a condition of employment and restricting internal access to its trade secrets through security software, passwords and usernames, and other technologies.

154.     Defendants intentionally and willfully misappropriated S&L's trade secrets through improper means.  *See id.*

155.     The former employees gained access to S&L's trade secrets while employed there, including but not limited to its client information, client lists, and client account numbers and names and related financial information.  Exs. 1–4.

156.     The former employees each entered employment agreements pursuant to which they agreed not to disclose or use S&L's trade secrets to advance their personal interests or any third-party's interests.  *Id.*

157.     The former employees further knew that S&L's client information, including their account names and numbers, and related information were trade secrets and proprietary, and recognized that in their agreements.

158.     The former employees have nevertheless disclosed and used S&L's trade secrets to advance their and FGWP's interests and harm S&L.

159.    FGWP further induced the former employees to disclose and use S&L's trade secrets in violation of their confidentiality obligations to further FGWP's business and harm S&L.

160.    Defendants' violations of the VUTSA have harmed and continue to harm S&L.

161.    Defendants have caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

162.    Defendants have further deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

163.    S&L is entitled to damages and restitution from Defendants, declaratory and injunctive relief, attorney's fees and costs, as well as all other available remedies, as set forth in its Prayer for Relief.  *See id*. §§ 59.1-336 to -38.

## <u>COUNT III</u>
**(Tortious Interference With Business Relations Against All Defendants)**

164.    S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

165.    S&L has significant and vital business relationships and expectancies with clients across the United States.

166.    The former employees, as being previously employed by S&L, have knowledge of those relationships and expectancies of S&L.

167.    The business relations and expectancies include but are not limited to the clients that the former employees previously serviced and worked with while employed at S&L.

168.    Moreover, because the former employees founded and are currently employed by FGWP, FGWP has knowledge of S&L's business relations with its clients.

169.     Defendants have maliciously and intentionally acted to prevent S&L from developing and maintaining its business relations with its clients.

170.     Defendants have willfully and intentionally solicited S&L's clients, working to induce and pressure them to leave S&L and become clients of FGWP through unlawful means by intentionally and willfully misappropriating S&L's trade secrets and engaging in unlawful and prohibited practices.

171.     By doing so, Defendants have prevented S&L from developing and pursuing business relationships with its clients.

172.     Defendants' conduct has harmed and continues to harm S&L.  S&L has had to expend more resources and incurred costs to maintain its business relationships with clients, all of which has resulted from Defendants' unlawful conduct.

173.     Defendants have also caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

174.     Defendants have further deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

175.     S&L is entitled to damages from Defendants, declaratory and injunctive relief, attorney's fees and costs, as well as all other available remedies, as set forth in its Prayer for Relief.

## <u>COUNT IV</u>
### (Breach Of Duty Of Loyalty Against Defendant Winters)

176.     S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

177.    Under Virginia law, employees, including at-will employees, owe a fiduciary duty of loyalty to his or her employer.

178.    The duty of loyalty requires that an employee not compete with his or her employer during the period of employment.

179.    Winters and S&L maintained a valid employment relationship, pursuant to which Winters was an at-will employee of S&L.

180.    Under that relationship, Winters owed S&L a duty of loyalty.

181.    Winters breached his duty of loyalty by, among other misconduct, competing against S&L while employed at the firm.

182.    While still employed at S&L, Winters developed and formed a competing entity, FGWP, and created and published a video announcing the formation of FGWP and soliciting clients.

183.    Winters further misappropriated S&L's trade secrets to develop his and FGWP's strategy of soliciting clients and intentionally interfering with S&L's client relationships.

184.    Winters' breaches have harmed and continue to harm S&L.

185.    Winters has deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

186.    Winters has also caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

187.    S&L is entitled to damages from Winters, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT V
### (Breach Of Duty Of Loyalty Against Defendant Atwood)

188.     S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

189.     Under Virginia law, employees, including at-will employees, owe a fiduciary duty of loyalty to his or her employer.

190.     The duty of loyalty requires that an employee not compete with his or her employer during the period of employment.

191.     Atwood and S&L maintained a valid employment relationship, pursuant to which Atwood was an at-will employee of S&L.

192.     Under that relationship, Atwood owed S&L a duty of loyalty.

193.     Atwood breached her duty of loyalty by, among other misconduct, competing against S&L while employed at the firm.

194.     While still employed at S&L, Atwood developed and formed a competing entity, FGWP, and created and published a video announcing the formation of FGWP and soliciting clients.

195.     Atwood further misappropriated S&L's trade secrets to develop her and FGWP's strategy of soliciting clients and intentionally interfering with S&L's client relationships.

196.     Atwood's breaches have harmed and continue to harm S&L.

197.     Atwood has deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

198.     Atwood has also caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

199.   S&L is entitled to damages from Atwood, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT VI
### (Breach Of Duty Of Loyalty Against Defendant Thompson)

200.   S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

201.   Under Virginia law, employees, including at-will employees, owe a fiduciary duty of loyalty to his or her employer.

202.   The duty of loyalty requires that an employee not compete with his or her employer during the period of employment.

203.   Thompson and S&L maintained a valid employment relationship, pursuant to which Thompson was an at-will employee of S&L.

204.   Under that relationship, Thompson owed S&L a duty of loyalty.

205.   Thompson breached her duty of loyalty by, among other misconduct, competing against S&L while employed at the firm.

206.   While still employed at S&L, Thompson developed and formed a competing entity, FGWP, and created and published a video announcing the formation of FGWP and soliciting clients.

207.   Thompson further misappropriated S&L's trade secrets to develop her and FGWP's strategy of soliciting clients and intentionally interfering with S&L's client relationships.

208.   Thompson's breaches have harmed and continue to harm S&L.

209.   Thompson has deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

210.     Thompson has also caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

211.     S&L is entitled to damages from Thompson, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

### COUNT VII
### (Breach Of Duty Of Loyalty Against Defendant Sorensen)

212.     S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

213.      Under Virginia law, employees, including at-will employees, owe a fiduciary duty of loyalty to his or her employer.

214.     The duty of loyalty requires that an employee not compete with his or her employer during the period of employment.

215.     Sorensen and S&L maintained a valid employment relationship, pursuant to which Sorensen was an at-will employee of S&L.

216.     Under that relationship, Sorensen owed S&L a duty of loyalty.

217.     Sorensen breached her duty of loyalty by, among other misconduct, competing against S&L while employed at the firm.

218.     While still employed at S&L, Sorensen developed and formed a competing entity, FGWP, and created and published a video announcing the formation of FGWP and soliciting clients.

219.     Sorensen further misappropriated S&L's trade secrets to develop her and FGWP's strategy of soliciting clients and intentionally interfering with S&L's client relationships.

220.     Sorensen's breaches have harmed and continue to harm S&L.

221.     Sorensen has deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

222.     Sorensen has also caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

223.     S&L is entitled to damages from Sorensen, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

<u>**COUNT VIII**</u>
**(Breach Of Contract Against Defendant Winters)**

224.     S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

225.     The FS Agreement is a valid contract between S&L and Winters.  Ex. 1.

226.     S&L fully performed its obligations under the FS Agreement by employing Winters upon his execution of the agreement and compensating Winters.

227.     Under the agreement, Winters agreed not to solicit any clients of S&L for two years following his employment with S&L.  *Id.* § 15.

228.     Winters further agreed not to disclose any confidential or proprietary information or use such information for his benefit or the benefit of any other entity other than S&L.  *Id.* § 14; *see id.*, Ex. C § 2.

229.     Winters has breached his obligations under the FS Agreement.

230.     Winters disclosed and used S&L's proprietary and confidential information, including its trade secrets related to S&L's client accounts and related financial information, to advance his and FGWP's interests.

231.     Winters further solicited S&L's clients, including but not limited to those to whom he provided services while at S&L during the Restricted Period.

232.     Virginia law further implies in every contract an obligation for each party to perform in good faith to fulfill the conditions of the contract.

233.     Winters intentionally breached his FS Agreement in bad faith to further his personal interests and harm S&L.

234.     Rather than comply with his contractual obligations to safeguard S&L's proprietary information and refrain from soliciting S&L's clients, Winters acted in bad faith to further his and FGWP's financial interests ahead of S&L's interest and his contractual obligations without any basis whatsoever.

235.     Winters disclosed and used S&L's proprietary information to further his and FGWP's interests and unlawfully compete against S&L.

236.     Winters' breaches of the FS Agreement have harmed and continue to harm S&L.

237.     Winters has caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

238.     Winters has further deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

239.     S&L is entitled to damages from Winters, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT IX
### (Breach Of Contract Against Defendant Atwood)

240.     S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

241.     The FS Agreement is a valid contract between S&L and Atwood.  Ex. 2.

242.     S&L fully performed its obligations under the FS Agreement by employing Atwood upon her execution of the agreement and compensating Atwood.

243.     Under the agreement, Atwood agreed not to solicit any clients of S&L for two years following her employment with S&L.  *Id.* § 15.

244.     Atwood further agreed not to disclose any confidential or proprietary information or use such information for her benefit or the benefit of any other entity other than S&L.  *Id.* § 14; *see id.*, Ex. C § 2.

245.     Atwood has breached her obligations under the FS Agreement.

246.     Atwood disclosed and used S&L's proprietary and confidential information, including its trade secrets related to S&L's client accounts and related financial information, to advance her and FGWP's interests.

247.     Atwood further solicited S&L's clients, including but not limited to those to whom she provided services while at S&L during the Restricted Period.

248.     Virginia law also implies in every contract an obligation for each party to perform in good faith to fulfill the conditions of the contract.

249.     Atwood intentionally breached her FS Agreement in bad faith to further her personal interests and harm S&L.

250.     Rather than comply with her contractual obligations to safeguard S&L's proprietary information and refrain from soliciting S&L's clients, Atwood acted in bad faith to further her own financial interests ahead of S&L's interest and her contractual obligations.

251.     Atwood disclosed and used S&L's proprietary information to further her and FGWP's interests and unlawfully compete against S&L.

252.    Atwood's breaches of the FS Agreement have harmed and continue to harm S&L.

253.    Atwood has caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

254.    Atwood has further deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

255.    S&L is entitled to damages from Atwood, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT X
### (Breach Of Contract Against Defendant Thompson)

256.    S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

257.    The AP Agreement is a valid contract between S&L and Thompson.  Ex. 3.

258.    S&L fully performed its obligations under the AP Agreement by employing Thompson upon her execution of the agreement and compensating Thompson.

259.    Under the agreement, Thompson agreed not to solicit any clients of S&L for two years following her employment with S&L.  *Id.* § 15.

260.    Thompson further agreed not to disclose any confidential or proprietary information or use such information for her benefit or the benefit of any other entity other than S&L.  *Id.* § 14; *see id.*, Ex. B § 2.

261.    Thompson has breached her obligations under the AP Agreement.

262.    Thompson disclosed and used S&L's proprietary and confidential information, including its trade secrets related to S&L's client accounts and related financial information, to advance her and FGWP's interests.

263.    Thompson further solicited S&L's clients, including but not limited to those to whom she provided services while at S&L during the Restricted Period.

264.    Virginia law implies in every contract an obligation for each party to perform in good faith to fulfill the conditions of the contract.

265.    Thompson intentionally breached her AP Agreement in bad faith to further her personal interests and harm S&L.

266.    Rather than comply with her contractual obligations to safeguard S&L's proprietary information and refrain from soliciting S&L's clients, Thompson acted in bad faith to further her own financial interests ahead of S&L's interest and her contractual obligations.

267.    Thompson disclosed and used S&L's proprietary information to further her and FGWP's interests and unlawfully compete against S&L.

268.    Thompson's breaches of the AP Agreement have harmed and continue to harm S&L.

269.    Thompson has caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

270.    Thompson has further deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

271.    S&L is entitled to damages from Thompson, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

### COUNT XI
**(Breach Of Contract Against Defendant Sorensen)**

272.    S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

273.     The AP Agreement is a valid contract between S&L and Sorensen.  Ex. 4.

274.     S&L fully performed its obligations under the AP Agreement by employing Sorensen upon her execution of the agreement and compensating Sorensen.

275.     Under the agreement, Sorensen agreed not to solicit any clients of S&L for two years following her employment with S&L.  *Id.* § 15.

276.     Sorensen further agreed not to disclose any confidential or proprietary information or use such information for her benefit or the benefit of any other entity other than S&L.  *Id.* § 14; *see id.*, Ex. B § 2.

277.     Sorensen has breached her obligations under the AP Agreement.

278.     Sorensen disclosed and used S&L's proprietary and confidential information, including its trade secrets related to S&L's client accounts and related financial information, to advance her and FGWP's interests.

279.     Sorensen further solicited S&L's clients, including but not limited to those to whom she provided services while at S&L during the Restricted Period.

280.     Virginia law also implies in every contract an obligation for each party to perform in good faith to fulfill the conditions of the contract.

281.     Sorensen intentionally breached her AP Agreement in bad faith to further her personal interests and harm S&L.

282.     Rather than comply with her contractual obligations to safeguard S&L's proprietary information and refrain from soliciting S&L's clients, Sorensen acted in bad faith to further her own financial interests ahead of S&L's interest and her contractual obligations.

283.     Sorensen disclosed and used S&L's proprietary information to further her and FGWP's interests and unlawfully compete against S&L.

284.    Sorensen's breaches of the AP Agreement have harmed and continue to harm S&L.

285.    Sorensen has caused S&L to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing S&L's client relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill with clients.

286.    Sorensen has further deprived S&L of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

287.    S&L is entitled to damages from Sorensen, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT XII
### (Declaratory Judgment Pursuant To 28 U.S.C. § 2201 Against All Defendants)

288.    S&L realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

289.    An actual and justiciable controversy exists concerning whether Defendants' conduct amounts to intentional and willful misappropriation of S&L's trade secrets in violation of the DTSA and VUTSA, and tortious interference with S&L's business relationships with its clients.

290.    An actual and justiciable controversy also exists concerning whether the former employees have violated the confidentiality, non-solicitation, and implied obligations of their respective employment agreements, as well as their duty of loyalty owed to S&L.

291.    S&L alleges Defendants have engaged in intentional and willful misappropriation of S&L's trade secrets as well as unfair and deceptive trade practices against S&L, and that the

former employees have breached their express and implied obligations under their FS and AP Agreements, while Defendants dispute S&L's allegations.

292.     Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties is necessary and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, S&L prays for this Court to enter judgment against FGWP, Winters, Atwood, Thompson, and Sorensen, granting the following relief:

1.     Declarations that:

- Defendants violated the DTSA by intentionally and willfully misappropriating S&L's trade secrets to solicit S&L's clients;

- Defendants violated the VUTSA by intentionally and willfully misappropriating S&L's trade secrets to solicit S&L's clients;

- Defendants tortiously interfered with S&L's client and business relationships;

- Winters breached his duty of loyalty owed to S&L by competing against S&L and misappropriating its trade secrets;

- Winters breached the FS Agreement by disclosing and using S&L's confidential and proprietary information to advance his and FGWP's interests and solicit S&L's clients;

- Winters breached his implied covenant of good faith and fair dealing owed to S&L by acting in bad faith to deprive S&L of the benefits of its bargain to protect its trade secrets and prevent the solicitation of its clients;

- Atwood breached her duty of loyalty owed to S&L by competing against S&L and misappropriating its trade secrets;

- Atwood breached the FS Agreement by disclosing and using S&L's confidential and proprietary information to advance her and FGWP's interests and solicit S&L's clients;

- Atwood breached her implied covenant of good faith and fair dealing owed to S&L by acting in bad faith to deprive S&L of the benefits of its bargain to protect its trade secrets and prevent the solicitation of its clients;

- Thompson breached her duty of loyalty owed to S&L by competing against S&L and misappropriating its trade secrets;

- Thompson breached the AP Agreement by disclosing and using S&L's confidential and proprietary information to advance her and FGWP's interests;

- Thompson breached her implied covenant of good faith and fair dealing owed to S&L by acting in bad faith to deprive S&L of the benefits of its bargain to protect its trade secrets and prevent the solicitation of its clients;

- Sorensen breached her duty of loyalty owed to S&L by competing against S&L and misappropriating its trade secrets;

- Sorensen breached the AP Agreement by disclosing and using S&L's confidential and proprietary information to advance her and FGWP's interests; and

- Sorensen breached her implied covenant of good faith and fair dealing owed to S&L by acting in bad faith to deprive S&L of the benefits of its bargain to protect its trade secrets and prevent the solicitation of its clients.

2. An injunction:

- Enjoining Defendants from disclosing and using any of S&L's trade secrets and proprietary information;

- Enjoining Defendants from intentionally and maliciously interfering with S&L's business relationships with its clients; and

- Enjoining each of the former employees from soliciting or attempting to solicit, on their own behalf or FGWP's behalf, any of S&L's clients during the Restricted Period.

3. Damages in an amount to be proven at trial;

4. Liquidated damages as required under the parties' agreements;

5. Statutory damages, including multipliers and equitable enhancements, as permitted by law;

6. Disgorgement by Defendants of all ill-gotten gains, as permitted by law;

7. Punitive damages in an amount to be proven at trial;

8. Attorney's fees and costs, as permitted by law;

9.      Pre-judgment and post-judgment and other interest on all monetary damages, as permitted by law; and

10.     Any and all such further relief the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, S&L demands a trial by jury in this action on all issues so triable as of right.

Dated: May 28, 2024

/s/ *Paul Werner*

Paul Werner (VSB No. 48910)
Imad Matini (VSB No. 90126)
Denise Giraudo (*pro hac vice* to be filed)
Chris Bauer (*pro hac vice* to be filed)
Tifenn Drouaud (*pro hac vice* to be filed)
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1931
Facsimile: 202-747-3817
pwerner@sheppardmullin.com
imatini@sheppardmullin.com
dgiraudo@sheppardmullin.com
cbauer@sheppardmullin.com
tdrouaud@sheppardmullin.com

*Attorneys for Plaintiff Salomon & Ludwin, LLC*

## <u>DECLARATION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the factual statements contained in the Verified Complaint related to S&L are true and correct to the best of my knowledge and belief.

Dalal Salomon
CEO, Founding Partner of S&L

Executed on May 28, 2024