**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| SALOMON & LUDWIN, LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) Case No. 3:24-cv-389 |
| | ) |
| v. | ) |
| | ) |
| JEREMIAH WINTERS, CATHERINE | ) |
| "KATE" ATWOOD, JENNIFER | ) |
| THOMPSON, ABBEY SORENSEN, and | ) |
| ALBERO ADVISORS, LLC, d/b/a | ) |
| FOUNDERS GROVE WEALTH PARTNERS, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

STANDARD ..................................................................................................................... 11

ARGUMENT .................................................................................................................... 11

    I.    S&L Is Likely To Succeed On The Merits Of Its Claims. ........................................ 11

        A.    Defendants Have Violated The Defend Trade Secrets Act (Count I). ........... 11

        B.    Defendants Have Violated The Virginia Uniform Trade Secrets Act
            (Count II)......................................................................................................... 13

        C.    Defendants Have Intentionally And Maliciously Interfered With
            S&L's Client Relationships (Count III). ........................................................ 14

        D.    The Former Employees Have Breached Their Duty Of Loyalty To
            S&L (Counts IV-VII). .................................................................................... 15

        E.    The Former Employees Have Breached Their Post-Employment
            Obligations (Counts VIII-XI). ....................................................................... 16

    II.    S&L Will Suffer Irreparable Harm Absent Injunctive Relief. .................................. 18

    III.    The Threatened Injuries To S&L Far Outweigh Any Potential Injury To
        Defendants...................................................................................................................... 19

    IV.    An Injunction Will Serve The Public Interest. ........................................................ 20

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

Cases

*Amazon.com, Inc. v. WDC Holdings LLC*,
  No. 1:20-CV-484, 2020 WL 9455205 (E.D. Va. Apr. 28, 2020) .......................................... 15

*Apollo Enterprise Imaging Corp. v. Conyers*,
  No. 1:19-cv-1603, 2020 WL 1896706 (E.D. Va. Jan. 10, 2020) ........................................... 18

*Capital One Fin. Corp. v. Sykes*,
  No. 3:20-cv-763, 2021 WL 2903241 (E.D. Va. July 9, 2021).......................................... 16, 18

*Dunlap v. Cottman Transmission Sys. LLC*,
  287 Va. 207 (2014)................................................................................................................. 14

*East West, LLC v. Rahman*,
  873 F.Supp.2d 721 (E.D. Va. 2012)....................................................................................... 14

*Enomoto v. Space Adventures, Ltd.*,
  624 F. Supp. 2d 443 (E.D. Va. 2009)..................................................................................... 17

*Getir US, Inc. v. Doe*,
  No. 1:21-cv-1237, 2021 WL 9145019 (E.D. Va. Nov. 19, 2021).......................................... 19

*GW Acquisition Co., LLC v. Pageland Limited Liability Company*,
  No. 1:23-cv-1207, 2023 WL 6541851 (E.D. Va. Oct. 6, 2023)............................................. 20

*Handsome Brook Farm, LLC v. Human Farm Animal Care, Inc.*,
  700 F. App'x. 251 (4th Cir. 2017).......................................................................................... 20

*Home Funding Group, LLC v. Myers*,
  No. 1:06-cv-6847953, 2006 WL 6847953 (E.D. Va. Dec. 14, 2006) ............................... 19, 20

*JTH Tax, Inc. v. Aime*,
  984 F.3d 284 (4th Cir. 2021)................................................................................................. 17

*LARUS Cloud Service Limited v. laruscloudservicesnet*,
  No. 1:20-cv-310, 2020 WL 4718064 (E.D. Va. Mar. 20, 2020)............................................ 19

*MicroStrategy, Inc. v. Bus. Objects, S.A.*,
  331 F. Supp. 2d 396 (E.D. Va. 2004)..................................................................................... 12

*Noble Supply & Logistics, LLC v. Curry*,
  No. 5:23-CV-00065, 2023 WL 8481021 (W.D. Va. Dec. 7, 2023) ....................................... 18

*O'Sullivan Films, Inc. v. Neaves*,
  352 F. Supp. 3d 617 (W.D. Va. 2018) ................................................................................... 18

*SDSE Networks, Inc. v. Mathur*,
    No. 1:22-cv-1024, 2022 WL 18109791 (E.D. Va. Sept. 15, 2022) ........................................ 18

*In re Search Warrant Issued June 13, 2019*,
    942 F.3d 159 (4th Cir. 2019).................................................................................................... 11

*Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*,
    191 F. Supp. 2d 652 (E.D. Va. 2002)....................................................................................... 12

*The Variable Annuity Life Ins. Co. v. Coreth*,
    535 F. Supp. 3d 488 (E.D. Va. 2021)..............................................................................*passim*

*Toolchex, Inc. v. Taylor*,
    634 F. Supp. 2d 586 (E.D. Va. 2008)........................................................................................ 19

*Williams v. Dominion Tech. Partners, L.L.C.*,
    576 S.E.2d 752 (Va. 2003).................................................................................................. 15, 16

<u>Statutes</u>

18 U.S.C. § 1839 ............................................................................................................................ 11, 13

Va. Code § 59.1-336, *et seq.* ........................................................................................................ 13, 14

<u>Other Authorities</u>

Fed. R. Civ. P. 65 ................................................................................................................................ 11

## **INTRODUCTION**

As each minute passes, Plaintiff Salomon & Ludwin, LLC ("S&L"), a premier client and financial services firm built on the reputation and hard work of its founders, suffers a loss and harm to the value of its client relationships, reputation and goodwill, and proprietary information.

This is a dire case in which the Court is called on to act immediately to stave off these irreparable harms.  S&L seeks a Temporary Restraining Order ("TRO") prohibiting its former employees Defendants Jeremiah Winters, Catherine "Kate" Atwood, Jennifer Thompson, Abbey Sorensen (together, the "former employees"), and their new company Albero Advisors, LLC, d/b/a Founders Grove Wealth Partners, LLC ("FGWP"), from willfully misappropriating its trade secrets and unlawfully soliciting and interfering with S&L's clients.

S&L hired Winters, Atwood, Thompson, and Sorensen over the course of a decade. S&L's founders mentored each of them personally, paid for their certifications and licenses, paid substantial salaries and benefits, trained them, and provided them with resources to develop their careers – even though none of the former employees ever prospected or brought in their own clients.  Yet, as it turns out, the former employees had a plot to turn on those that had invested so much in them; indeed, they worked behind the scenes for quite some time to develop a scheme to sabotage S&L's operations, steal its valuable trade secrets, engage in a mass and sudden departure, and form a competing entity, FGWP.

Following their May 24, 2024, mass resignation, Defendants have engaged in brazen and unlawful conduct.  The former employees have improperly misappropriated confidential and proprietary information to solicit hundreds of clients and pressure them to join FGWP.  In doing so, they have harmed S&L's reputation and goodwill with its clients, deprived it of protections over its proprietary information and client relationships, and harmed the firm's operations and standing.

-1-

Faced with such obvious irreparable harms – as well as the fact that Defendants' conduct violates federal and state laws in addition to their contractual and implied obligations to S&L – the Court should issue immediate preliminary relief to prevent any further harm to S&L.

## BACKGROUND

Founded in 2009 by Dalal Salomon and Daniel Ludwin, S&L provides wealth management and financial services to clients in Richmond and across the United States.  ECF No. 1, Verified Complaint ("Cmplt.") ¶¶ 33–34.  S&L offers clients unparalleled service and commitment to help them "make smart decisions about their money."[1]  *Id.* ¶ 35.  To that end, S&L has adopted a deliberate approach toward its employees to develop strong, long-term relationships with its clients.  These relationships are critical to S&L's business.  *Id.* ¶¶ 36–52.

S&L has a team of 12 employees and executives, which includes financial advisors and operational professionals.  *Id.* ¶ 37.  Financial advisors operate to provide general asset management and financial planning and advice.  *Id.* ¶ 38.  Operational professionals maintain day-to-day interactions with S&L's clients to ensure they receive a premier client experience and develop long-standing relationships.  *Id.* ¶ 39.  S&L's financial advisors and operational professionals receive extensive and comprehensive training to advise clients and manage their assets.  *Id.* ¶ 40.  The firm mentors and trains its employees, pays fees necessary to obtain their licenses and certifications, and provides other resources for them to develop strong relationships with current and prospective clients.  *Id.* ¶ 41.

During their training and employment with S&L, financial advisors and operational professionals receive access to substantial amounts of confidential and proprietary information.  *Id.* ¶ 42.  This information includes compiled client information, client account names and numbers, and related financial information.  *Id.* ¶ 43.  S&L also provides its financial advisors and operational

---

[1]  *See Salomon & Ludwin*, https://salomonludwin.com/ (last visited May 28, 2024).

professionals with information related to S&L's operating procedures, existing or forthcoming products and services, including its patented TriggerPoint™ Strategy, and strategic business plans. *Id.* ¶ 44.

S&L's proprietary information is extremely valuable. *Id.* ¶ 45. If publicly disclosed and used, competitors could easily target and solicit S&L's most valuable and valued clients. *Id.* S&L develops and maintains its proprietary information in its Richmond office for use across the United States. *Id.* ¶ 46. S&L invests substantially in compiling and developing its proprietary information to protect its market position as a highly regarded wealth management firm, spending substantial funds and time to develop its proprietary information, including but not limited to its client information, client lists, and client accounts and names – all of which have taken years to develop and build. *Id.* ¶ 47.

S&L provides its employees with the proprietary information noted above to support their efforts to provide quality client services and develop important and valuable client relationships with S&L. *Id.* ¶ 48. None of S&L's proprietary information is publicly available. *Id.* ¶ 49. Given the significant value of and investment in developing its proprietary information, employees may only access it using unique passwords and user identification to use specially-made systems where the information is stored. *Id.* ¶ 50.

Through their targeted and long-term engagements with clients, S&L's financial advisors and operational professionals develop goodwill and relationships with clients on behalf of the firm. *Id.* ¶ 51. These relationships are valuable and critical to S&L's business. *Id.* ¶ 52.

***Non-Solicitation Obligations.*** To protect S&L's substantial investments in its employees, proprietary information, and client relationships, S&L requires its financial advisors to enter a Financial Services Professional Employment Agreement ("FS Agreement"). *Id.* ¶ 53; Exs. 1–2.[2] It

---

[2] All exhibits cited in this motion refer to the exhibits attached to ECF No. 1, Plaintiff's Verified

also requires operational professionals to enter an Administrative Professional Employment Agreement ("AP Agreement," with FS Agreement," "Employment Agreement"). *Id.* ¶ 54; Exs. 3-4. The FS Agreement and AP Agreement contain the same or substantially similar terms. *Id.* ¶ 55; *compare* Exs. 1 & 2, with Exs. 3–4.

Financial advisors and operational professionals are hired as "at will" employees. FS Agreement § 12; AP Agreement § 12. Under the Employment Agreement, financial advisors and operational professionals agree that S&L "owns all current and future clients, client relationships, and equity in such client relationships, as well as rights to all revenue generated from such clients" by S&L. FS Agreement § 7; AP Agreement § 7. To that end, financial advisors and operational professionals agree to non-solicitation obligations.

Thus, they agree not to "solicit any supplier, service provider, customer, or other business relation" of S&L "that has previously referred business to the company . . . to become a business relation of Employee" during the time of their employment with S&L and for two years after the employment ends ("Restricted Period"). FS Agreement § 15(a)(ii); AP Agreement § 15(a)(ii). They also agree not to "suggest to a business relation of the Company that the business relation should reduce or terminate the business relation's business or relationship with the Company," or directly or indirectly "provide any financial services or sell financial service products to clients of the Company." FS Agreement § 15(a)(iii)–(iv); AP Agreement § 15(a)(iii)-(iv).

For any breach of the Employment Agreement's non-solicitation provision, an employee must, as liquidated damages for each breach, pay S&L an amount equal to three times the total "Gross Revenue" earned from "such client(s) . . . during the previous twelve (12) month period." FS Agreement § 15(b)(i); AP Agreement § 15(b)(i).[3] In entering an Employment Agreement, each

---

Complaint, filed contemporaneously with this motion.
[3] Gross Revenue is defined as "all revenue generated by a client that has been earned" by S&L. FS Agreement § 15(b)(iii). The liquidated damages "shall be paid on a promissory note maturing in

financial advisor and operational professional agrees the non-solicitation restrictions are "reasonable in scope" and that "such restrictions afford fair protection to the interests of S&L." FS Agreement § 16; AP Agreement § 16. Additionally, they agree that S&L's relationships with its clients, customers, or any business relation "are trade secrets that the Company has developed through great time, effort, and expense," the non-solicitation restrictions "are essential to protect such trade secrets," and that any breach "of a restriction constitutes a prohibited conflict of interest and unfair competition." *Id.* Financial advisors and operational professionals also agree not to disclose any "confidential information." FS Agreement § 14; AP Agreement § 14. Confidential information broadly includes "information relating to customers, clients, suppliers, investors, lenders, consultants . . . customer and client lists, price lists and pricing policies . . . financial statements and information," and "all notes, analyses, compilations, studies, summaries, reports, manuals, documents, and other materials prepared by or for" S&L "containing or based in whole or in part on any of the foregoing." FS Agreement, Ex. C, § 2(a); AP Agreement, Ex. B, § 2(a). Financial advisors and operational professionals agree that all confidential information is "owned or licensed" by S&L; is deemed "valuable, proprietary, and confidential"; and "derives independent actual or potential commercial value from not being generally known or available to the public." FS Agreement, Ex. C § 2(b); AP Agreement, Ex. B § 2(b).

They also agree they "will not at any time claim, any right, title or interest of any kind" in S&L's confidential information, and are prohibited from disclosing or using such information during or after their employment for their "personal benefit" or the "benefit of any other" third-party. FS Agreement, Ex. C § 2(b); AP Agreement, Ex. B § 2(b). If a financial advisor or operational professional breaches their confidentiality obligations, S&L is entitled to damages "from the [e]mployee" as well as "preliminary and . . . injunctive" relief because S&L will "suffer

---

twelve (12) months and bearing interested at the Prime Rate" plus "two percent" per annum. *Id.* § 15(b)(ii).

irreparable harm in the event of such breach." FS Agreement, Ex. C § 3(a)-(b); AP Agreement, Ex. B § 3(a)-(b). The Employment Agreement also provides that S&L is "not part of or subject to broker protocols," including protocols related to client solicitation or confidential information, and that the agreement "shall apply and control in the event that any terms" of the agreement or broker protocols conflict. FS Agreement § 25; AP Agreement § 25.

### S&L Hires Winters, Atwood, Thompson, And Sorensen To Provide Client And Financial Services

Starting in or around 2009, S&L began steadily to hire additional financial advisors and operational professionals to join its team. S&L hired Winters, Atwood, Thompson, and Sorensen between 2009 and 2017. Cmplt. ¶¶ 72. Winters and Atwood became financial advisors and Thompson and Sorensen became operational professionals. *Id.*

These former employees received extensive and comprehensive training from S&L to provide premier client and financial services as well as asset management. *Id.* ¶ 73. S&L paid for all of their relevant certifications, licensing, and other costly requirements. *Id.* ¶ 74. Indeed, S&L is where Winters and Atwood received most, if not all, of their financial advisor training and development. *Id.* ¶ 75. The former employees also had access to S&L's confidential and proprietary information, including customer information, customer account names and numbers, and related financial information. *Id.* ¶ 76.

Each of the former employees entered an Employment Agreement with S&L that contained the same or substantially similar terms and conditions described above. *Id.* ¶ 77. Winters and Atwood each entered an FS Agreement, while Thompson and Sorensen each entered an AP Agreement. *Id.* ¶ 78. Thus, the former employees were prohibited from using or disclosing S&L's confidential and proprietary information. *Id.* ¶ 79. They were also prohibited from soliciting S&L clients or business relations for two years following their employment with S&L. *Id.* ¶ 80.

Winters, Atwood, Sorenson, and Thompson each worked directly with hundreds of S&L's clients located across the United States.  *Id.* ¶ 81.

With the exception of family members, none of the former employees had their own clients when they joined S&L.  *Id.* ¶ 82.  Additionally, none of the former employees ever prospected or developed their own clients while working for S&L, instead relying on in-house or other referrals from clients already working with S&L.  *Id.* ¶ 83.  Even though the former employees did not bring in a single client to S&L, they continued to receive substantial compensation and benefits from S&L.  *Id.* ¶ 84.  Indeed, S&L paid Winters $650,000 per year in compensation and benefits, while Atwood, Sorensen, and Thompson each were paid over $250,000.  *Id.* ¶ 85.

### *The Former Employees Suddenly Leave S&L To Form FGWP, Stealing Trade Secrets And Clients And Harming The Firm*

Not satisfied with their role at S&L, the former employees began devising a scheme to line their pockets by intentionally stealing S&L's clients and sabotaging its operations.  *Id.* ¶ 86.  In the lead up to their eventual May 24, 2024 departure from S&L, the former employees founded a competing wealth management firm, FGWP, on or around April 1, 2024.  *Id.* ¶ 87.  The former employees also retained a consulting firm, Dynasty Financial Partners, Inc. ("Dynasty"), to assist in the development of FGWP's founding and opening.[4]  *Id.* ¶ 88.

Even though they were still employed by S&L, the former employees deliberately prepared promotional materials for their new company, including a video – released May 21, 2024 (three days prior to their official resignation) – to announce their separation from S&L and the opening of FGWP.[5]  *Id.* ¶ 89.  Below is a screenshot of their published video announcement:

---

[4]  *See Dynasty Financial Partners*,
https://dynastyfinancialpartners.com/?utm_source=google&utm_medium=cpc&utm_term=na &utm_content=core &utm_campaign=brand (last visited May 28, 2024).
[5]  Founders Grove Wealth Partners (vimeo.com) (last visited May 27, 2024).



The former employees also worked deliberately to sabotage S&L's operations to undermine its response to their future departure and potentially cripple its operations. *Id.* ¶ 90. Given S&L's small size and long-term investment in its employees, the former employees knew that their departure – 2 of S&L's 4 financial advisors and 2 of its 4 operational professionals – would seriously and adversely impact S&L's operations. *Id.* ¶ 91.

To that end, Thompson deliberately halted the development and updating of S&L's training manuals and transition processes for clients. *Id.* ¶ 92. That manual and those processes are vital to bringing any newly hired staff up to speed on an expedited basis. *Id.* Thompson was responsible for updating and developing S&L's training manuals and transition processes. *Id.* ¶ 93. Yet for months, Thompson refused to move the update and developments forward. *Id.* ¶ 94. Instead, Thompson stalled and worked to undermine their development to ensure that, when the former employees left, S&L would be seriously hampered in responding to their misconduct and hiring new staff. *Id.* ¶ 95.

The Defendants' plans unfolded on May 24, 2024 – timing their resignation for the Memorial Day holiday weekend. The former employees resigned three days after they published their FGWP video announcement online. *Id.* ¶ 97. On the same day as their resignation, *i.e.* May 24, 2024, the former employees actively solicited many of S&L's clients – potentially hundreds. *Id.* ¶ 98. The former employees used S&L's client information, lists, and account names, among other

trade secrets and proprietary information, to solicit clients located throughout the United States and intentionally interfere with S&L's client relationships.  *Id.* ¶ 99.  For example, Winters, on behalf of the former employees and FGWP, contacted clients by text message to explain they "lauch[ed]" their own independent wealth management firm, "Founders Grove," and that they would receive more information "over the long weekend" about the new venture.  *Id.* ¶ 100.  The following is a copy of one such text message:



The former employees also began calling and leaving clients voicemails, and pressuring S&L's clients to sign new broker agreements to transfer their accounts and assets to FGWP.  *Id.* ¶ 102.  Confused by the mass-departure and the former employees' pressure tactics, clients began calling S&L to understand the situation.  *Id.* ¶ 104.  They expressed concern over the ability of S&L

to provide the same level of client services and management given the reduction in personnel.  *Id.* ¶ 105.

### Defendants' Unfair And Unlawful Conduct
### Has Caused S&L Serious And Irreparable Harms

Without a doubt, Defendants have engaged in a host of unlawful and improper conduct that has harmed – and continues to harm – S&L.  *Id.* ¶ 106.  Defendants have intentionally and willfully misappropriated S&L's trade secrets to compete against S&L.  *Id.* ¶ 107.  S&L has, for many years, invested substantial resources to develop proprietary information related to its clients, including client lists, account numbers and names, and other related financial information.  *Id.* ¶ 108.

The former employees received access to these trade secrets while employed by S&L.  The former employees each agreed to refrain from disclosing or using such information to advance any interests adverse to S&L.  *Id.* ¶ 110.  The former employees nevertheless disclosed and used this information to advance their and FGWP's interests and unlawfully compete against S&L.  *Id.* ¶ 111.  FGWP further used improper means to misappropriate S&L's proprietary information by inducing the former employees to violate their contractual obligations that prohibit them from disclosing and using such information.  *Id.* ¶ 112.  In addition to misappropriating S&L's proprietary information, Defendants engaged in other unlawful and disturbing tactics to compete unfairly against S&L.  *Id.* ¶ 113.  FGWP has intentionally induced the former employees to breach post-employment obligations owed to S&L by disclosing S&L's trade secrets and soliciting S&L's employees to further FGWP's interests and harm S&L.  *Id.* ¶ 114.

Defendants' unlawful conduct has harmed and continues to harm S&L.  *Id.* ¶ 117.  To date, Defendants have unlawfully solicited many of S&L's clients – potentially hundreds of clients.  *Id.* ¶ 118.  Defendants have further deprived S&L of the value of its substantial investments in its proprietary information and goodwill and relationships with its clients.  *Id.* ¶ 119.  Defendants have also caused continuing and irreparable harm to S&L by intentionally interfering with S&L's client

relationships, as well as misusing and misappropriating S&L's confidential information and trade secrets. *Id.* ¶ 120. Defendants have further harmed S&L's goodwill and reputation with its clients by casting doubt on its capabilities and impacting its training and transition processes. *Id.* ¶ 121.

## STANDARD

This is the type of case that cries out for the emergency relief afford by a TRO. To obtain one, a party must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities weighs in its favor; and (4) a preliminary injunction is in the public interest. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019); *The Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021) ("The standard for granting either a TRO or a preliminary injunction is the same."); *see also* Fed. R. Civ. P. 65. And "[f]inding a likelihood of success on only one claim is sufficient 'to justify injunctive relief.' " *Coreth*, 535 F. Supp. 3d at 494 n.3 (quoting *W. Indus.-N., LLP v. Lessard*, No. 1:12cv177, 2012 WL 859459, at *5 (E.D. Va. Mar. 13, 2012)). S&L meets the test for such preliminary relief here.

## ARGUMENT

**I.     S&L Is Likely To Succeed On The Merits Of Its Claims.**

**A.     Defendants Have Violated The Defend Trade Secrets Act (Count I).**

S&L is likely to succeed on the merits of its Defend Trade Secrets Act ("DTSA") claim. To prevail on a DTSA claim, a plaintiff must show the existence of a protectable trade secret and misappropriation of that trade secret. *Coreth*, 535 F. Supp. 3d at 515-16; *see* 18 U.S.C. § 1839. S&L easily satisfies those elements here.

*First*, S&L's trade secrets exist and are directly at issue. It is well settled that trade secrets are information that the owner takes "reasonable measures" to keep secret and from which independent "economic value" is derived from such information remaining secret and not disclosed

-11-

or used by another person.  *Coreth*, 535 F.3d at 515 (cleaned up and internal quotation marks

omitted).  Thus, trade secrets under the DTSA broadly include "all forms and types of financial,

business, scientific, technical, economic, or engineering information," including "client

information" and lists.  *Id.* at 515; *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396,

416 (E.D. Va. 2004) ("[T]he case law is clear that just about anything can constitute a trade secret

under the right set of facts.").  Here, S&L's client lists, client background information, and account

names all "qualif[y]" as trade secrets.  *Coreth*, 535 F. Supp. 3d at 515.  As alleged in its Verified

Complaint, S&L takes reasonable and extensive measures to safeguard these trade secrets, including

the use of "several layers of user IDs and passwords" and having its "financial advisors" and

operational professionals "execute confidentiality agreements."  *Id.* at 514; Cmplt. ¶¶ 50 & 132.

And, the trade secrets have "independent economic value" by remaining a secret because a

competitor armed with this information could target S&L's "most valuable and valued clients."

*Coreth*, 535 F. Supp. 3d at 514; Cmplt. ¶¶ 127-28.

Indeed, the parties have already recognized that this information is a trade secret because the

former employees – who are current officers and employees of FGWP – agreed under each of their

Employment Agreements that any information "relating to customers [and] clients" constitutes

"proprietary" information and S&L "derives independent actual or potential commercial value

from" that information "not being generally known or available to the public."  FS Agreement Ex.

C § 2(a)-(b); AP Agreement Ex. B, § 2(a)-(b).  The parties' Agreements leave no room for dispute

that S&L's client lists, account names, and related information "easily qualif[y]" as trade secrets

under the DTSA.  *Coreth*, 535 F. Supp. 3d at 513; *see Stone Castle Fin., Inc. v. Friedman, Billings,*

*Ramsey & Co.*, 191 F. Supp. 2d 652, 664 (E.D. Va. 2002).

*Second*, Defendants have misappropriated (and, absent a TRO will continue to

misappropriate) S&L's trade secrets.  Misappropriation occurs when a person knowingly

-12-

acquires a trade secret that was acquired by improper means, or uses or discloses the trade secret after acquiring it through improper means.  *See* 18 U.S.C. § 1839(5)(A)-(B).  And "improper means" includes the "breach or inducement of a breach of a duty to maintain secrecy."  *Id.* § 1839(6)(A); *Coreth*, 535 F. Supp. 3d at 515.  Here, Defendants have clearly misappropriated S&L's trade secrets.  The former employees knew that the client information and account names were proprietary information, that they had access to that information only by virtue of their employment with S&L, and acquired it "while under a duty to maintain that information's confidentiality" based on their confidentiality obligations.  *Coreth*, 535 F. Supp. 3d at 504.  The former employees, as members and employees of FGWP, then disclosed that information to FGWP and used it to solicit S&L's clients.  Cmplt. ¶¶ 15 & 95-105.  FGWP, as founded and operated by the former employees, further induced them to the join the company and use S&L's proprietary information despite their contractual obligations to maintain their secrecy and not use them to further their or FGWP's interests.  *Id.*

Accordingly, there is "clear evidence" that the Defendants "acquired and used trade secrets without consent," and therefore, S&L is "likely to succeed on the merits" of its DTSA claim.  *Coreth*, 536 F. Supp. 3d at 514.

## B.     Defendants Have Violated The Virginia Uniform Trade Secrets Act (Count II).

For substantially the same reasons as its DTSA claim, S&L is also likely to succeed on the merits of its Virginia Uniform Trade Secrets Act ("VUTSA") claim.  That is because the "standards applicable under the VUTSA are nearly identical to those under the DTSA."  *Coreth*, 535 F. Supp. 3d at 514 (internal quotation marks omitted).  Thus, just like for a DTSA claim, a plaintiff must show the existence of a protectable trade secret and misappropriation of that trade secret to prevail on a VUTSA claim.  *Id.*; Va. Code § 59.1-336, *et seq.*

-13-

Here, Defendants have plainly misappropriated S&L's trade secrets in violation of the VUTSA. The client lists, information, account numbers, and account names are all trade secrets under the VUTSA given their economic value and S&L uses extensive measures to keep them secret. *See* Va. Code § 59.1-336; *Coreth*, 535 F. Supp. 3d at 513-14; *supra at* 3 & 10. Moreover, Defendants' conduct constitutes a knowing acquisition and misuse of its trade secrets through improper means – that is, by the former employees' disclosure of S&L's trade secrets and use to further their and FGWP's interests in violation of their confidentiality obligations. *Coreth*, 535 F. Supp. 3d at 513-14; *supra* at 3 & 10.

### C. Defendants Have Intentionally And Maliciously Interfered With S&L's Client Relationships (Count III).

Additionally, S&L is likely to succeed on the merits of its tortious interference claim. To establish that claim, S&L must show the existence of a business relationship with a probability of future economic benefit to it; that Defendants knew of the relationship and used improper methods to interfere with it; a reasonable certainty exists that S&L would have continued to reap the benefits of that relationship but for Defendants' misconduct; and resulting damages. *See East West, LLC v. Rahman*, 873 F.Supp.2d 721, 734 (E.D. Va. 2012); *Dunlap v. Cottman Transmission Sys.*, LLC, 287 Va. 207, 216 (2014).

Here, Defendants have intentionally and willfully interfered with S&L's business relations. As alleged in the Verified Complaint, S&L has (and, has had for many years) an established and existing business relationship with numerous clients, including clients that previously worked with the former employees. Cmplt. ¶¶ 81-83. Those relationships are further valuable to S&L and likely to generate benefits in the form of continued asset management and fees for the firm. *Id.* Given their longstanding employment with S&L, the former employees knew of the clients that S&L had relationships with, and upon joining FGWP, disclosed those relationships to it as well. *Supra* at 10.

-14-

With knowledge of S&L's client relationships, Defendants intentionally and willfully solicited S&L's clients in breach of their contractual and legal obligations.  *Id.*  The former employees each expressly agreed not to "solicit any supplier, service provider, customer, or other business relation" of S&L "that has previously referred business to the company . . . to become a business relation of Employee" during the Restricted Period.  FS Agreement § 15(a)(ii); AP Agreement § 15(a)(ii).  Yet, Defendants blatantly violated this restriction, and upon doing so, S&L's clients raised concerns about staying with the firm, which required S&L to deploy resources to keep the clients and maintain business relationships with them.  Cmplt. ¶¶ 98-104.  Accordingly, Defendants have tortiously interfered with S&L's business relations, meaning they should be "enjoined from disrupting" its relationships going forward.  *Amazon.com, Inc. v. WDC Holdings LLC*, No. 1:20-CV-484, 2020 WL 9455205, at *3 (E.D. Va. Apr. 28, 2020) (granting TRO because Amazon was likely to succeed on the merits of its tortious interference claim).

### D.    The Former Employees Have Breached Their Duty Of Loyalty To S&L (Counts IV-VII).

The former employees' misconduct also constitutes violations of their duty of loyalty to S&L.  In Virginia, all employees – including at will employees – owe a duty of loyalty to their employers during the term of employment.  *Williams v. Dominion Tech. Partners, L.L.C.,* 576 S.E.2d 752, 757 (Va. 2003).  Within this duty, an employee may not compete with their employer while employed.  *Id.*  Traditional forms of breach include misappropriation of trade secrets, misuse of confidential information, or soliciting an employer's clients before employment ends.  *Id.* at 758.

The former employees have each violated this basic duty.  Each of the employees maintained valid at-will employment relationships with S&L.  Cmplt. ¶¶ 179, 191, 203 & 215.  Yet, while employed at S&L, each of the former employees violated their duty of loyalty by developing and forming FGWP.  Indeed, they formed the entity on or around April 1, 2024 – almost two months before their departure from S&L on May 24, 2024 – and even brazenly published videos

-15-

announcing the formation of FGWP and soliciting clients *while still employed by S&L*.  Cmplt.

¶¶ 89 & 97.  The former employees also misappropriated S&L's trade secrets to develop their and

FGWP's strategy of soliciting clients and interfering with S&L's relationships.  All of those actions

are in breach of the former employees' duty of loyalty.  *Williams*, 576 S.E.2d at 757-58.  And they

have caused S&L to suffer serious and ongoing harms – namely, jeopardizing S&L's client

relationships, misappropriating S&L's trade secrets, and harming S&L's reputation and goodwill

with clients, among other irreparable and serious harms.  *See, e.g.*, Cmplt. ¶ 143; *see also Williams*,

576 S.E.2d at 757-58.

### E.     The Former Employees Have Breached Their Post-Employment Obligations (Counts VIII-XI).

In addition to breaching their duty of loyalty, the former employees have each breached

their contractual obligations to S&L.  To prove its breach of contract claim, S&L must show each

former employee entered a valid and enforceable agreement with S&L, that each of them violated

or breached obligations under the agreement, and resulting harm to S&L.  *Capital One Fin. Corp. v.*

*Sykes*, No. 3:20cv763, 2021 WL 2903241, at *12–13 (E.D. Va. July 9, 2021) (finding Capital One

was likely to succeed on the merits of its claim that former employees breached their nondisclosure

agreements by disclosing confidential information, including customer lists, to a direct competitor).

Here, the former employees each entered FS and AP Agreements with S&L.  Cmplt. ¶¶ 225,

241, 257 & 273; Exs. 1-4.  Under each agreement, each former employee agreed not to solicit any

clients of S&L for two years following their employment at the firm, disclose any proprietary

information, or use S&L's proprietary information for their personal benefit or the benefit of any

other third party.  Cmplt. ¶¶ 227, 243, 259 & 275; Exs. 1-4.  Despite these clear obligations, the

former employees have willfully and flagrantly breached them.  They have disclosed and used

S&L's proprietary and confidential information, including its trade secrets related to client accounts

and related financial information, to advance their personal interests and FGWP's interests.  Cmplt.

¶¶ 230-38, 246-254, 262-270 & 278-86.  And each of these former employees have solicited S&L's clients during the Restricted Period.

The former employees have also breached the implied covenant underlying their agreements with S&L as well.  Under Virginia law, every contract contains an implied covenant of good faith and fair dealing, meaning that parties must act in good faith in performing their contractual obligations.  *JTH Tax, Inc. v. Aime*, 984 F.3d 284, 294 (4th Cir. 2021) (interpreting Virginia law); *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009).  Here, rather than comply in good faith with their contractual obligations to safeguard S&L's proprietary information and refrain from soliciting S&L's clients, the former employees acted in bad faith to do just the opposite.  The agreements expressly prohibited them from soliciting "any supplier, service provider, customer, or other business relation" of S&L "that has previously referred business to the company . . . to become a business relation of Employee" during Restricted Period, FS Agreement § 15(a)(ii); AP Agreement § 15(a)(ii), and from disclosing or using S&L's trade secrets during or after their employment for their "own benefit" or the "benefit of any other" third-party, FS Agreement, Ex. C § 2(c); AP Agreement, Ex. B § 2(c).  Yet, by online videos, text messages, and even phone calls, they have unlawfully competed against S&L and willfully disclosed and used S&L's proprietary information to further their and FGWP's interests.  Those are hallmark examples of "bad faith and unfair dealing in a contractual relationship."  *Enomoto*, 624 F. Supp. 2d at 450-51.

As a result of their breaches of the agreements and implied covenant, S&L has suffered ongoing and irreparable harm.  The former employees' breaches have jeopardized S&L's client relationships, resulted in the willful misappropriation of its trade secrets, and harmed its reputation and good will with clients.  Cmplt. ¶¶ 98-104.  It now faces the unfair position of having to compete with FGWP – a competitor that now has access to S&L's confidential proprietary information without having to go through the effort and investments S&L had to make to develop such

information.  That further constitutes competitive and resultant "harm" to S&L caused by the former employees' breaches and misconduct, which supports injunctive relief.  *Sykes*, 2021 WL 2903241, at *13.

## II.       S&L Will Suffer Irreparable Harm Absent Injunctive Relief.

S&L further satisfies the irreparable harm requirement.  As an initial matter, the parties agreed that any breach of the confidentiality obligations of the FS and AP Agreements automatically results in "irreparable harm" to S&L.  Cmplt. ¶ 69, Exs. 1-2, Ex. C § 3(b) & Exs. 3-4, Ex. B § 3(b).  Where as here, the parties agree that breaches of restrictive covenants constitutes irreparable harm, that easily "satifis[fies] the irreparable harm element."  *Noble Supply & Logistics, LLC v. Curry*, No. 5:23-CV-00065, 2023 WL 8481021, at *8 (W.D. Va. Dec. 7, 2023); *O'Sullivan Films, Inc. v. Neaves*, 352 F. Supp. 3d 617, 628 (W.D. Va. 2018) (contractual agreement that breach entitled party to proceed "without the need to prove actual damages" and stating that "temporary and permanent injunctive relief" was appropriate for breach satisfied the irreparable injury and inadequacy of damages element of the preliminary injunction analysis).  Thus, on that basis alone, the Court should find S&L has suffered irreparable harm and issue preliminary relief.

But putting aside the parties' contracts, S&L will be irreparably harmed if immediate injunctive relief is not granted.  The fact Defendants have stolen and misappropriated trade secrets alone constitutes irreparable harm because "a trade secret, once lost is, of course lost forever."  *SDSE Networks, Inc. v. Mathur*, No. 1:22-cv-1024, 2022 WL 18109791, at *2 (E.D. Va. Sept. 15, 2022); *Coreth*, 535 F. Supp. at 516-518 (finding actual and imminent irreparable harm where defendant possessed copies of "trade secrets" and had already transferred customer accounts away from plaintiff); *Apollo Enterprise Imaging Corp. v. Conyers*, No. 1:19-cv-1603, 2020 WL 1896706, at *4 (E.D. Va. Jan. 10, 2020) (finding irreparable harm where plaintiff likely to succeed on merits

of trade secret claims); *Home Funding Group, LLC v. Myers*, No. 1:06-cv-6847953, 2006 WL 6847953, at \*2 (E.D. Va. Dec. 14, 2006) (same).

Additionally, S&L has suffered ongoing harm to its reputation and goodwill, which also are irreparable and warrant the issuance of injunctive relief. *Getir US, Inc. v. Doe*, No. 1:21-cv-1237, 2021 WL 9145019, at \*4 (E.D. Va. Nov. 19, 2021) (stating "harm to [plaintiff's] reputation" is "irreparable harm" sufficient to justify a temporary restraining order); *Toolchex, Inc. v. Taylor*, 634 F. Supp. 2d 586, 591-92 (E.D. Va. 2008) ("A party may prove that it was irreparably injured by showing . . . the possibility of a risk to the party's reputation."); *LARUS Cloud Service Limited v. laruscloudservicesnet*, No. 1:20-cv-310, 2020 WL 4718064, at \*4 (E.D. Va. Mar. 20, 2020) (finding "damage to reputation" is "immediate and irreparable injury"). Here, by intentionally interfering with and soliciting S&L's clients, Defendants have created false concerns about the firm's ability to care for its clients and maintain its services. Cmplt. ¶¶ 104-05. They have even gone so far as to imply that S&L intends to stop working with certain clients because of supposed minimum account requirements – which is false. Cmplt. ¶ 103. By casting doubt and concerns about S&L, Defendants have harmed its reputation, standing, and goodwill with its clients. *Id.* That is a textbook example of "immediate and irreparable injury." *LARUS Cloud Service Limited*, 2020 WL 4718064, at \*4.

## III.   The Threatened Injuries To S&L Far Outweigh Any Potential Injury To Defendants.

The balance of hardships also supports entry of a TRO. Issuing a TRO will harm no one, including the Defendants. But, absent injunctive relief, S&L will continue to suffer the misappropriation of its trade secrets and interference and solicitation of its clients – client relationships and trade secrets that are solely the property of S&L under the parties' agreements. Cmplt. ¶¶ 98-105. Defendants should not continue to "benefit from their misappropriation" of S&L's trade secrets and other unlawful conduct, *Coreth*, 535 F. Supp. at

518, or be allowed to continue to "tarnish[ ]" S&L's business reputation as they improperly solicit its clients, *Handsome Brook Farm, LLC v. Human Farm Animal Care, Inc.*, 700 F. App'x. 251, 263 (4th Cir. 2017).

But Defendants face no similar harm.  The Defendants may lawfully compete against S&L and other wealth management companies so long as they abide the law and their contractual obligations to S&L.  *Coreth*, 535 F. Supp. 3d at 518 (issuing injunction because defendants could still "compete" against plaintiff, "just not by soliciting their former clients" or misappropriating trade secrets).  Together, the balance of hardships weigh decidedly in favor of issuing a TRO.

**IV.     An Injunction Will Serve The Public Interest.**

Public interest considerations also weigh strongly in favor of granting immediate injunctive relief in this case.  The public interest is readily served by "allowing firms to protect trade secrets and confidential information, and by providing a forum to seek temporary injunctive relief to enjoin any further breach or disclosure, potentially causing irreparable harm."  *Home Funding Group*, 2006 WL 6847953, at *3.  In addition, the public interest strongly favors the enforcement of contracts and post-employment obligations, like those at issue here.  *GW Acquisition Co., LLC v. Pageland Limited Liability Company*, No. 1:23-cv-1207, 2023 WL 6541851, at *9  (E.D. Va. Oct. 6, 2023) ("The enforcement of valid contractual obligations is consistent with public policy, and there is no public interest weighing against such enforcement."). But absent a TRO, Defendants will be authorized to continue violating S&L's legitimate rights and interests.  The public interest does not support that result.

<u>**CONCLUSION**</u>

The Court should grant S&L's motion and enter a TRO: (1) enjoining Defendants from disclosing and using any of S&L's trade secrets and proprietary information; (2) enjoining

Defendants from intentionally and maliciously interfering with S&L's business relationships with its clients; and (3) enjoining each of the former employees from soliciting or attempting to solicit, either personally or on behalf of FGWP, any of S&L's clients during the Restricted Period.

Dated: May 28, 2024

/s/ *Paul Werner*

Paul Werner (Bar No. 48910)
Imad Matini (Bar No. 90126)
Denise Giraudo (*pro hac vice* to be filed)
Chris Bauer (*pro hac vice* to be filed)
Tifenn Drouaud (*pro hac vice* to be filed)
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1931
Facsimile: 202-747-3817
pwerner@sheppardmullin.com
imatini@sheppardmullin.com
dgiraudo@sheppardmullin.com
cbauer@sheppardmullin.com
tdrouaud@sheppardmullin.com

*Attorneys for Plaintiff Salomon & Ludwin, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing on all counsel of record on May 28, 2024.  Counsel for all Defendants have been sent copies via electronic mail and all Defendants has also been sent copies of this filing by hard copy at the following:

Albero Advisors, LLC
d/b/a Founders Grove Wealth Partners, LLC
6802 Paragon Place, Suite 426
Richmond, VA 23230

Jeremiah R. Winters
2352 Manakin Road,
Manakin-Sabot, Virginia 23103

Catherine Atwood
218 Melwood Lane
Henrico, Virginia 23229-7312

Jennifer W. Thompson
10198 Williamsville Road
Mechanicsville, Virginia 23116

Abbey Sorensen
14101 Rockyrun Road
Chesterfield, Virginia 23838

Sharron E. Ash
228 Park Ave S, PMB 51917
New York, NY 10003-1502
sash@hamburgerlaw.com
*Counsel for All Individual Defendants*

/s/  Paul A. Werner