IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SALOMON & LUDWIN, LLC,              )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        Civil Action No. 3:24-cv-389–HEH
                                    )
JEREMIAH WINTERS, *et al.*,         )
                                    )
            Defendants.             )

## MEMORANDUM OPINION
### (Granting Plaintiff's Motion for Preliminary Injunction)

THIS MATTER is before the Court on Plaintiff Salomon & Ludwin, LLC's

("Plaintiff") Motion for Preliminary Injunction (the "Motion," ECF No. 47), filed on

June 24, 2024.  Plaintiff seeks a preliminary injunction against Defendants Jeremiah

Winters ("Winters"), Catherine Atwood ("Atwood"), Jennifer Thompson ("Thompson"),

Abbey Sorensen ("Sorensen"), and Albero Advisors, LLC, d/b/a Founders Grove Wealth

Partners, LLC ("FGWP") (collectively, "Defendants"), pursuant to Federal Rule of Civil

Procedure 65.  (Mot. at 1.)  The Court heard oral argument on July 9, 2024.  The Court

will grant Plaintiff's Motion for the reasons articulated below.

## I. BACKGROUND

Plaintiff is a wealth management firm based in Richmond, Virginia, that was

formed in 2009.  (Compl. ¶¶ 2–3, ECF No. 1.)  At the beginning of this year, Plaintiff's

team consisted of twelve (12) employees, which included four (4) financial advisors, four

(4) operational professionals, one (1) trader, and three (3) executives.  (*Id.* ¶ 37.)  Plaintiff

provides its employees with proprietary client information, including client lists, client account names and contact information, and financial information, among other things. (*Id.* ¶¶ 8, 43.)  This information is protected, is not publicly available, and Plaintiff developed it over the course of multiple years.  (*Id.* ¶¶ 47–50.)

To protect this information, Plaintiff requires its financial advisors to sign a Financial Services Professional Employment Agreement (the "FS Agreement," ECF No. 1-1).[1]  (Compl. ¶ 53.)  Likewise, Plaintiff requires its operational professionals to sign an Administrative Professional Employment Agreement (the "AP Agreement," ECF No. 1-3)[2] (collectively, the "Agreements").  (Compl. ¶ 54.)  The Agreements state that Plaintiff maintains the rights to all current and future clients and the revenue generated from them.  (FS Agreement § 7(a); AP Agreement § 7.)  The Agreements also contain non-solicitation provisions which prohibit Plaintiff's employees from soliciting clients for two (2) years after the end of their employment.  (FS Agreement § 15(a)(ii); AP Agreement § 15(a)(ii).)  Additionally, the Agreements include a liquidated damages clause, which require an employee to pay "three (3.0) times the total Gross Revenue earned from referred clients . . . during the previous twelve (12) month period" if the employee breaches the non-solicitation provision.  (FS Agreement § 15(b)(i); AP

---

[1] Plaintiff attached the FS Agreements for both Defendant Winters (ECF No. 1-1) and Defendant Atwood (ECF No. 1-2).  Because the two (2) agreements are substantially similar, the Court will cite to Winters' Agreement as representative of both.

[2] Similarly to the FS Agreement, Plaintiff attaches both Defendant Thompson's AP Agreement (ECF No. 1-3) and Defendant Sorensen's AP Agreement (ECF No. 1-4).  The Court will cite to Defendant Thompson's AP Agreement as representative of them both.

Agreement § 15(b)(i).)

The Agreements further state that Plaintiff's client relationships "are trade secrets that [Plaintiff] has developed through great time, effort, and expense." (FS Agreement § 16; AP Agreement § 16.) They include a Confidentiality Agreement, attached as an exhibit, where employees agree to refrain from disclosing "information relating to customers, clients, suppliers, investors, lenders, consultants . . .; customer and client lists, price lists and pricing policies; financial statements and information; . . . and all notes, analyses, compilations, studies, summaries, reports, manuals, documents and other materials prepared by or for" Plaintiff containing the foregoing information. (FS Agreement § 14, Ex. C § 2(a); AP Agreement § 14, Ex. B § 2(a).) The parties agree that Plaintiff "will suffer irreparable harm in the event of" a breach of the confidentiality provision. (FS Agreement at Ex. C § 3(b); AP Agreement at Ex. B § 3(b).)

Plaintiff hired Winters, Atwood, Thompson, and Sorensen between 2009–2017. (Compl. ¶ 72.) Winters and Atwood were financial advisors and Thompson and Sorensen were operational professionals. (*Id.*) Each of them entered into either an FS Agreement or an AP Agreement, based on their positions. (*Id.* ¶¶ 77–78.) Plaintiff paid for their training and certifications and gave them access to confidential information. (*Id.* ¶¶ 73–76.) Other than their family members, none of these employees brought in any clients to the firm when they were hired, nor did they bring in new clients while working for Plaintiff. (*Id.* ¶¶ 82–84.)

While still working for Plaintiff, Winters, Atwood, Thompson, and Sorensen

3

founded their own wealth management firm, FGWP, around April 1, 2024. (*Id.* ¶ 87.)
They also created promotional materials for FGWP, including a video uploaded to the
internet on May 21, 2024. (*Id.* ¶ 89.) Winters, Atwood, Thompson, and Sorensen
resigned on May 24, 2024, and immediately began soliciting Plaintiff's clients. (*Id.*
¶¶ 97–98.) They contacted Plaintiff's clients via text and voicemail and used Plaintiff's
confidential client information in doing so. (*Id.* ¶¶ 99–102.) Plaintiff has lost over 100
clients and over $300,000,000 in client assets thus far. (Hearing Ex. 6 at 1.)

This string of events led Plaintiff to file this lawsuit and seek a temporary
restraining order ("TRO") and preliminary injunction against Defendants. Plaintiff raises
the following claims in its Complaint: Violations of the Defend Trade Secrets Acts, 18
U.S.C. § 1836(b)(1) against all Defendants (Count I); Violations of the Virginia Uniform
Trade Secrets Act, Virginia Code § 59.1-336, *et seq.*, against all Defendants (Count II);
Tortious Interference with Business Relations against all Defendants (Count III); Breach
of Duty of Loyalty against Defendants Winters, Atwood, Thompson, and Sorensen
(Counts IV–VII); Breach of Contract against Defendants Winters, Atwood, Thompson,
and Sorensen (Counts VIII–XI); and Declaratory Judgment Pursuant to 28 U.S.C. § 2201
against all Defendants (Count XII). (*See* Compl. ¶¶ 125–292.) The Court granted
Plaintiff's Motion for Emergency Temporary Restraining Order (ECF No. 8) and entered
a TRO (ECF No. 46) on June 20, 2024.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to protect the status

quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)).  A decision to grant a preliminary injunction is within the sound discretion of the district court. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Di Biase*, 872 F.3d at 229).  In conducting the analysis, the Court must bear in mind that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  It is only awarded after the movant establishes that "(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent the requested preliminary relief, (3) the balance of equities weighs in its favor, and (4) a preliminary injunction is in the public interest." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019), as amended (Oct. 31, 2019) (citing *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc)).

## III.  DISCUSSION

### A.  Plaintiff is likely to succeed on the merits.

Plaintiff argues that it is likely to succeed on all of its claims, except for Count XII, which is its declaratory judgment claim.  (Mem. in Supp. at 10–16, ECF No. 48.) "Finding a likelihood of success on only one claim is sufficient to justify injunctive relief." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021) (internal quotations and citation omitted); *see also Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1292 (M.D.N.C.), *aff'd*, 892 F.2d 74 (4th Cir. 1989).  Here, the

Court finds that Plaintiff is likely to succeed on the merits of Counts I and II.  Therefore, the Court need not analyze the strength of Plaintiff's remaining claims.

Counts I and II allege the misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and the Virginia Uniform Trade Secrets Act ("VUTSA"). (*See* Compl. ¶¶ 125–63.)  To establish a misappropriation of trade secrets claim under the DTSA, a plaintiff must show (1) the information constitutes a trade secret, and (2) the defendant misappropriated the trade secret by improper means or conspired to use improper means to misappropriate the trade secret.  18 U.S.C. § 1836(b)(2)(A)(ii)(IV). The DTSA defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that (1) "the owner thereof has taken reasonable measures to keep [] secret; and [(2)] the information derives independent economic value . . . from not being generally known [] and not being readily ascertainable through proper means." *Id.* § 1839(3).  A defendant misappropriates a trade secret if he acquires a trade secret by improper means or discloses or uses a trade secret without consent. *Id.* § 1839(5).  Improper means "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6).

Under the VUTSA, a plaintiff must show that the defendant misappropriated its trade secrets through improper means.  VA. CODE ANN. § 59.1-336, *et seq.*  The VUTSA's definitions of trade secrets, misappropriation, and improper means are nearly identical to those definitions in the DTSA. *See id.*; *OROS, Inc. v. Dajani*, No. 119-cv-

6

351 LMB/IDD, 2019 WL 2361047, at *2 (E.D. Va. June 4, 2019) ("[I]n critical respects,
the applicable standards under the DTSA and . . . the VUTSA [] are nearly identical.").
Because the DTSA and VUTSA are substantially similar, the Court addresses Plaintiff's
success on the merits of these claims together.

Plaintiff relies heavily on *Variable Annuity Life Ins. Co. v. Coreth*, arguing that
Defendants violated the DTSA and VUTSA by misappropriating Plaintiff's client lists,
client background information, and account names. (Mem. in Supp. at 10–12.) This
information is likely a trade secret under the DTSA and VUTSA. Plaintiff protects the
information with "several layers of user IDs and passwords" and its employees sign
confidentiality agreements. (*Id.* at 10 (citing Compl. ¶ 50).) Plaintiff also asserts that the
client information has economic value because a competitor could use it to poach clients.
(*Id.* at 10–11.) Further, Defendants' Agreements state that Plaintiff's client information
has independent economic value derived from being confidential. (*See* FS Agreement at
Ex. C § 2(a)–(b); AP Agreement at Ex. B § 2(a)–(b).) Based on these facts, it is likely
that Plaintiff's client information constitutes a trade secret.

Plaintiff next argues that Defendants acquired the information through improper
means because they breached their duty to maintain secrecy. (Mem. in Supp. at 11–12.)
Defendants each signed a confidentiality agreement barring them from disclosing
Plaintiff's confidential client information. (*See* FS Agreement § 14, Ex. C § 2(a); AP
Agreement § 14, Ex. B § 2(a).) Plaintiff states that Defendants breached this duty when
they disclosed Plaintiff's client information to FGWP and used it to solicit clients.

7

(Mem. in Supp. at 11–12.)

During oral argument, Defendants asserted that Plaintiff failed to meet its evidentiary burden to show that Defendants removed Plaintiff's client information. (Tr. at 50:10–51:4, ECF No. 63.) Defendants argued that Plaintiff only presented an expert witness during the hearing who could not conclusively say that client information was taken. (*See id.*) However, Defendants ignore the evidence in the record that indicates they had taken and were using Plaintiff's client information. In Winters' and Atwood's own resignation letters, they admit that they took certain client information and account names with them when they resigned. (Winters Decl. ¶ 7, ECF No. 18-1; Atwood Decl. ¶ 6, ECF No. 18-2; Atwood Resignation Letter at 1, ECF No. 18-7; Winters Resignation Letter at 1, ECF No. 18-8.) Additionally, the fact that hundreds of Plaintiff's clients have moved their accounts to FGWP is circumstantial evidence that Defendants used Plaintiff's client information to solicit these clients. (Salomon Decl. ¶ 27, ECF No. 48-1.) Accordingly, Plaintiff has adequately shown that Defendants took confidential information and used it after their employment ended.

Defendants do not contest that Plaintiff's client information constitutes a trade secret. Instead, Defendants argue that they were allowed to use the client information they took under the Protocol for Broker Recruiting (the "Protocol"). (Mem. in Opp'n at 15–16, ECF No. 52.) If a financial services firm is a signatory to the Protocol, it allows financial advisors from that firm to take certain information if they leave to join another firm that is also a signatory to the Protocol. (Protocol at 1, ECF No. 18-10.) This

8

information includes the "client name, address, phone number, email address, and account title of the clients that [the financial advisor] serviced while at the firm." (*Id.*) The resigning employee must provide a written resignation, detailing the client information that the employee is taking with them. (*Id.*) The Protocol includes exemptions for "raiding" and for advisors who are part of a team agreement. (*Id.* at 1–2.)

Defendants assert that they did not violate the DTSA or the VUTSA because they abided by the rules of the Protocol, which Plaintiff and FGWP are signatories to. (Mem. in Opp'n at 15–16.) Plaintiff first responds that Defendants' Agreements override the Protocol because they expressly state that the Agreements take precedence over the Protocol. (Mem. in Supp. at 2–5.) Plaintiff also states that, even if the Protocol does control, the raiding and team agreement exceptions apply. (*Id.* at 5–8.) The Court begins with an analysis of the raiding exception and finds that, in the event the Protocol controls, the raiding exception likely applies here. Because of this finding, it is unnecessary for the Court to determine whether Defendants' Agreements override the protocol or whether the team agreement exception applies.

The Protocol does not define the term "raiding," nor have other courts addressed it. Hence, the parties introduce competing industry definitions of "raiding" for the Court to consider. Plaintiff cites two (2) articles that provide definitions of "raiding." (Reply at 6–7, ECF No. 54.) One, written by a financial advisor, defines "raiding" as when "a recruiting firm takes a large volume of advisors and staff members all at once . . . and transcends into damaging the prior firm itself." Michael Kitces, *Complying with the*

9

*Broker Protocol When Changing Firms or Going Independent*, KITCES.COM (Aug. 22, 2016), https://www.kitces.com/blog/broker-protocol-recruiting-requirements-for-moving-brokers-to-breakaway-or-go-independent-ria/. The other, written by multiple industry experts, states that the majority of participants in an industry conference on raiding agree "that proving a raiding claim requires showing that a 'severe economic impact' resulted and that the alleged raider's behavior involved 'malice/predation' and/or 'improper means'" . . . . John D. Finnerty et al., *Calculating Damages in Broker Raiding Cases*, 11:2 Stan. J.L. Bus. & Fin. 261, 264 (2006). They also agreed that a severe economic impact exists when "the alleged improper hiring involves at least 40 percent of the business unit's production." *Id.* The authors emphasize, however, that experts in the field "have difficulty agreeing upon the very definition of raiding." *Id.* at 263.

During the preliminary injunction hearing, Defendants called industry expert John Maine to provide the Court with a definition of raiding. Maine stated that raiding consists of three (3) elements: (1) taking at least 40% of production, (2) improper means, and (3) predation. (Tr. at 86:22–87:7, 88:16–89:6.) He explained that predation meant "trying to put somebody out of business." (*Id.* at 89:2–3.) His definition only differs from the one offered in the Finnerty article in that Maine believes a party must show both predation *and* improper means, while Finnerty states that a party must show "'malice/predation' *and/or* 'improper means.'" (*Id.* 86:22–87:5; 88:16–20); Finnerty, *supra*, at 264 (emphasis added). Defendants also imply that their departure cannot meet the definition of raiding because they left to form their own firm as opposed to being

10

hired by an already competing firm. (Mem. in Opp'n at 14.) The industry definitions provided to the Court do not directly address this, but the Court finds no reason why a financial services firm cannot be raided from within by a group of employees conspiring to leave at once and create their own firm.

The Court will adopt, in large part, the definition of "raiding" provided in the Finnerty article. However, the Court will view the requirement that a firm lose at least 40% of production as a guideline rather than a hard cutoff. Here, that definition appears to be met. Defendants Winters, Atwood, Thompson, and Sorensen comprised 40% of Plaintiff's employees. When broken down by financial advisors, Winters and Atwood made up half of Plaintiff's financial advising team. Additionally, though it is unclear what percentage of accounts were taken from Plaintiff, FGWP took over 400 accounts, containing assets of over $300,000,000. (Hearing Ex. 6 at 1.) The Court finds that the combination of the number of employees that left and the amount of clients lost constitute a severe economic impact to Plaintiff.

It also appears that Defendants acted with predation. Defendants state that they had legitimate, non-business reasons to terminate their employment with Plaintiff. (Mem. in Opp'n at 14.) Though three (3) of them did provide other reasons for resigning in their resignation letters, the circumstances speak for themselves. Winters, Atwood, Sorensen, and Thompson all resigned on the same day, all formed FGWP, and then began soliciting Plaintiff's clients. Additionally, Daniel Gleisner, a digital investigator, testified that he recovered artifacts related to FGWP on Sorensen's and Winters' computers,

11

which were created *before* they resigned from their positions with Plaintiff. (Tr. at 27:18–28:9; 29:15–25.) These facts demonstrate that Defendants colluded together to leave Plaintiff, create FGWP, and take a substantial amount of Plaintiff's business with them, thus satisfying the element of predation.

Accordingly, Defendants' actions likely fall under the raiding exemption of the Protocol, and Winters, Atwood, Sorensen, and Thompson are still subject to their duties of confidentiality. For these reasons, Plaintiff is likely to succeed on Counts I and II.

### B. Plaintiff is likely to suffer irreparable harm.

The Court next analyzes whether Plaintiff is likely to suffer irreparable harm absent injunctive relief. To establish irreparable harm, the plaintiff "must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotations and citation omitted). "[T]he harm must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (internal quotations and citation omitted).

Plaintiff has established that it will likely suffer irreparable harm. The Fourth Circuit has held that the loss of goodwill in the plaintiff's industry, loss of customers, and loss of the ability to attract new customers may entitle the plaintiff to injunctive relief. *See Signature Flight Supp. Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011). "[C]ourts frequently grant injunctions when there is a substantial risk that the defendant[] will continue to divulge or misappropriate trade secrets in the

absence of court action." *ClearOne Advantage, LLC v. Kersen*, No. JKB-23-3446, 2024

WL 69918, at *7 (D. Md. 2024) (citation omitted).  The Court finds *Coreth* instructive

here.  *Coreth* also involved financial advisors who left their prior firm, took client

information with them, and solicited former clients.  535 F. Supp. 3d at 495–99.  The

district court found that, because Plaintiff was able to show that it lost at least seventy-

one clients (71), it suffered irreparable harm.[3]  *Id.* at 516 n.26, 517–18.  Here, Plaintiff

has shown that it has lost over 100 clients and over 400 accounts.  Plaintiff has asserted a

loss of goodwill and business reputation in the wealth advising industry.  (Mem. in Supp.

at 9.)  It has also provided evidence of Defendants' unauthorized use of its confidential

client information.  *See supra* Section III.A.

        Defendants assert that Plaintiff will not be irreparably harmed because it is a

signatory to the Protocol and, thus, anticipated that its former financial advisors could use

its client information.  (Mem. in Opp'n at 23–25.)  As the Court discussed in the previous

section, it is likely that an exception to the Protocol applies here, leaving it largely

inapplicable.  *See supra* Section III.A.  Defendants also argue that the liquidated damages

provision in the Agreements provide Plaintiff with an adequate monetary remedy.  (Mem.

in Opp'n at 21–23.)  However, a liquidated damages provision alone does not preclude

injunctive relief if there is a "high likelihood of permanent loss of former and potential

---

[3] *Coreth* deals directly with the two (2) Eastern District of Virginia cases that Defendants cite in
support of the proposition that injury from lost clients can be compensated with monetary
damages. (*See* Mem. in Opp'n at 21.)  Both cases were decided under an old test that is obsolete
after *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). *Coreth*, 535 F. Supp. 3d at 516
n.26.  Moreover, these cases did not provide substantial evidence that the defendants took client
information with them and then used it to solicit clients. *Id.*

customers." *JTH Tax, Inc. v. Donofrio*, No. 2:06-cv-47, 2006 WL 2796841, at *5 (E.D. Va. Sept. 26, 2006). Here Plaintiff has established that there is a high likelihood that it has permanently lost clients and that it will continue to do so absent injunctive relief. (*See* Hearing Ex. 6.) Thus, Plaintiff will likely suffer irreparable harm absent the issuance of a preliminary injunction.

### C. The balance of equities tips in favor of Plaintiff.

Next, the Court must "balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002). The balance of the equities and hardship to the parties tips heavily in favor of injunctive relief. As previously discussed, Plaintiff is likely to prevail on its misappropriation of trade secrets claims, and is currently suffering, and will continue to suffer, irreparable harm. On the other hand, Defendants face minimal harm from the Court prohibiting them from further soliciting Plaintiff's clients. *See Coreth*, 535 F. Supp. 3d at 518 (finding that injunctive relief would only somewhat impair the defendant's ability to earn a living, because it still allowed them to directly compete with the plaintiff); *Fidelity Glob. Brokerage Grp., Inc. v. Gray*, No. 1:10-cv-1255, 2010 WL 4646039, at *4 (E.D. Va. Nov. 9, 2010) ("Simply put, if it is true that [the defendant] is contractually barred from using customer information he learned [during his employment with Plaintiff] in his current position, then [the defendant] loses nothing by an injunction prohibiting him from doing so."). Nothing in the preliminary injunction would prevent Defendants from continuing to service the clients they have, nor would it prevent them

14

from adding new clients. The only limitation is that they would be unable to *proactively* solicit Plaintiff's clients. Thus, the balance of equities strongly favors the issuance of a preliminary injunction.

### D. A preliminary injunction is in the public interest.

The public interest favors the protection of confidential business information. *See ABT, Inc. v. Juszczyk*, No. 5:09-cv-119, 2010 WL 3156542, at \*9 (W.D.N.C. Aug. 10, 2010); *Home Funding Grp., LLC v. Myers*, No. 1:06-cv-1400 JCC, 2006 WL 6847953, at \*3 (E.D. Va. Dec. 14, 2006). A preliminary injunction in this case supports the public interest of safeguarding confidential information. Defendants argue that the public interest is not served by an injunction because it would inhibit individuals' freedom to choose their financial advisor. (Mem. in Opp'n at 27–28.) However, an injunction here would not prohibit Defendants from working with Plaintiff's former clients, nor would it prohibit clients from leaving Plaintiff's firm of their own volition. It would only prevent Defendants from soliciting Plaintiff's clients, leaving the clients free to choose who they would like to hire as their financial advisor. Thus, the public interest favors the issuance of a preliminary injunction.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's Motion for Preliminary Injunction. The Court does not find it appropriate to grant Plaintiff's request to escrow Defendants' management fees because there is no evidence of fraud in this case. *See, e.g., Amazon.com, Inc v. WDC Holdings LLC*, No. 1:20-cv-484, 2020 WL 4720086, at \*2

(E.D. Va. June 5, 2020), *aff'd sub nom. Amazon.com, Inc. v. WDC Holdings LLC*,

No. 20-1743, 2021 WL 3878403 (4th Cir. Aug. 31, 2021) (ordering the defendants to

place funds in an escrow account because there was evidence of fraud).

    An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: July 23, 2024
Richmond, Virginia

16